**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN EDWARD CRITTENDEN,
            *Petitioner-Appellant,*

            v.

ROBERT L. AYERS,*
            *Respondent-Appellee.*

No. 05-99006

D.C. Nos.
CV-97-00602-
FCD/GGH
CV-95-01957-FCD

ORDER
AMENDING
OPINION AND
DENYING
PETITIONS FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
December 13, 2007—Pasadena, California
Submission Withdrawn March 1, 2010
Resubmitted August 13, 2010

Filed August 20, 2010
Amended November 2, 2010

*Robert L. Ayers, the current custodian, is substituted for Steven W. Ornoski as Warden of the California State Prison at San Quentin, pursuant to Fed. R. App. P. 43(c)(2).

18073

Before: Jerome Farris, Raymond C. Fisher and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Mark Goldrosen (argued), San Francisco, California, and Michael L. Spiegel (argued), New York, New York, for the petitioner-appellant.

Edmund G. Brown, Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Ward A. Campbell, Supervising Deputy Attorney General, Jesse N. Witt, Deputy Attorney General, and Eric L. Christoffersen (argued), Deputy Attorney General, for the respondent-appellee.

## ORDER

The opinion filed on August 20, 2010, slip op. 12331, and appearing at 2010 WL 3274506, is amended as follows:

In Section I.C.1 of the opinion, at slip op. 12351, 2010 WL 3274506, at *8, the first paragraph, which states:

> Under *Batson*'s first step, the defendant must establish a prima facie case of purposeful discrimination. *See Batson*, 476 U.S. at 93-94. He must show that (1) he is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove a juror of defendant's race and (3) the totality of the circumstances raises an inference that the strike was on account of race. *Id.* at 96; *see Johnson*, 545 U.S. at 169; *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006). The first and second elements of the test are met here, because Crittenden and the prospective juror are African-American and the prosecutor used a peremptory strike to remove the prospective juror. Thus, only the third element of the prima facie case is at issue — whether the California state court erred in failing to recognize that the totality of the circumstances raised an inference of racial motivation.

shall be deleted and replaced with the following paragraph:

Under *Batson*'s first step, the defendant must establish a prima facie case of purposeful discrimination. *See Batson*, 476 U.S. at 93-94. He must show that (1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raises an inference that the strike was on account of race. *Id.* at 96; *see Johnson*, 545 U.S. at 169; *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006). The first and second elements of the test are met here, because the prospective juror is African-American and the prosecutor used a peremptory strike to remove the prospective juror. Thus, only the third element of the prima facie case is at issue — whether the California state court erred in failing to recognize that the totality of the circumstances raised an inference of racial motivation.

In Section II.A of the opinion, at slip op. 12360, 2010 WL 3274506, at *12, the second paragraph, which states:

A "postcard" denial by the California Supreme Court is a denial on the merits. *See Harris v. Superior Court*, 500 F.2d 1124, 1128 (9th Cir. 1974) (en banc); *see also Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008) ("[U]nless a court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible."). The first sentence of the California Supreme Court's order thus constitutes an adjudication on the merits of Crittenden's state habeas petition — necessarily including all aspects of his IAC claim — in its entirety. The second sentence elaborates the court's rationale for denying Crittenden's subclaims relating to alleged deficiencies in trial counsel's investigation of his mental status. As to those subclaims, we afford

the full effect of AEDPA's "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (internal quotation marks omitted). As to the remainder of his IAC claim, we "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable," because the state-court adjudication was not reasoned. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (internal quotation marks omitted).

shall be deleted and replaced with the following paragraph:

A "postcard" denial by the California Supreme Court is a denial on the merits. *See Harris v. Superior Court*, 500 F.2d 1124, 1128 (9th Cir. 1974) (en banc); *see also Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008) ("[U]nless a court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible."). The first sentence of the California Supreme Court's order thus constitutes an adjudication on the merits of Crittenden's state habeas petition — necessarily including all aspects of his IAC claim — in its entirety. We therefore accord AEDPA deference to the California Supreme Court's disposition of those claims. *See Gonzalez v. Brown*, 585 F.3d 1202, 1206 (9th Cir. 2009); *see also* 28 U.S.C. § 2254(d). Because the state court's decision was not reasoned, however, we "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (internal quotation marks omitted).

With these amendments, the panel has voted to deny Appellant's and Appellee's petitions for rehearing. Judges

Fisher and Berzon have voted to deny Appellant's petition for rehearing en banc and Judge Farris so recommends.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellant's petition for rehearing and petition for rehearing en banc, filed September 16, 2010, is **denied**. Appellee's petition for rehearing, filed September 21, 2010, is **denied**. No further petitions for panel rehearing or rehearing en banc will be entertained.

---

**OPINION**

FISHER, Circuit Judge:

In 1989, a California jury convicted Steven Crittenden of two murders and sentenced him to death. He now appeals the denial of his federal habeas petition. Four claims are at issue here: (1) whether the state trial prosecutor exercised a peremptory challenge to exclude an African-American prospective juror on account of her race in violation of the Equal Protection Clause of the Fourteenth Amendment, as articulated in *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) whether Crittenden's trial counsel were constitutionally ineffective; (3) whether the shackling of Crittenden during trial was objectively unreasonable; and (4) whether a juror's consultation of the Bible at home and her discussion of a biblical passage with other jurors during penalty-phase deliberations constituted prejudicial juror misconduct. On the *Batson* claim, we vacate the district court's judgment and remand for further proceedings in light of the standard articulated in *Cook v. LaMarque*, 593 F.3d 810 (9th Cir. 2010). On all other claims we affirm the district court.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On January 17, 1987, Joseph Chiapella found his parents — both in their late sixties — bound, gagged and stabbed to death in their Chico, California home. Katherine Chiapella sustained massive injuries to her head and face and two deep knife wounds to her chest and upper abdomen. The cause of her death was multiple trauma, primarily from her forehead and chest wounds. William Chiapella suffered 13 wounds of varying severity. The cause of his death was multiple trauma, caused primarily by a large chest wound — a knife was driven completely inside his body — and blunt-force injuries to the right side of his head. Both killings had taken place four days before, on January 13.

The police quickly focused their suspicions on Crittenden. Several months before the murders, the Chiapellas had hired Crittenden, then a student at California State University at Chico, to perform yard work. An eyewitness selected Crittenden's photograph as resembling the college-age, African-American man he saw walking towards the Chiapella residence on January 13. On January 14, Crittenden cashed a $3,000 check signed by Katherine Chiapella, made payable to him and dated January 13. On January 21, the police executed a search warrant on Crittenden's apartment, where they found sheets with a strawberry pattern that matched the design on the bindings used to tie up the Chiapellas. They also seized a pair of black tennis shoes whose soles matched a shoe print left in the Chiapella residence. Crittenden was arrested the same day. At the police station, Crittenden said that Katherine Chiapella had paid him to perform various sexual activities on at least 12 occasions between August and December 1986. He claimed that the $3,000 check was payment for one particular encounter on January 9, which took place in Room 96 of the Thunderbird Lodge. He stated that he had not worn his black

---

[1]We generally recite the facts as established in the state court proceedings. *See People v. Crittenden*, 885 P.2d 887 (Cal. 1994) ("*Crittenden I*").

tennis shoes since the previous fall. He also told police that he had never gone inside the Chiapella residence and had spent the afternoon of January 13 at the gym with three people he named. These explanations could not withstand scrutiny. Crittenden's bank account did not reflect any of the supposed payments other than the $3,000 check. Neither Katherine Chiapella nor Crittenden had registered at the Thunderbird Lodge on January 9; tellingly, there was no Room 96 at the motel. Crittenden's left thumbprint was obtained from an automatic teller slip found on the desk in the Chiapellas' study. And his alibi witnesses said they last saw him at the gym on January 7, but not thereafter, and so discredited Crittenden's alibi.

While awaiting trial in the Butte County jail in May 1987, Crittenden escaped and then kidnapped a man, commandeering his truck and forcing him to drive towards Chico, and later Sacramento. Upon arriving in Sacramento, Crittenden fled on foot but was apprehended later that day. Crittenden made two subsequent escape attempts in September 1988 and March 1989, the September attempt involving an assault on a prison guard.

The guilt phase of trial began March 14, 1989. Crittenden presented an alibi defense. On April 24, the jury found him guilty of two counts of first-degree murder (with special findings that the murders were willful and premeditated and committed during the course of a robbery), one count of robbery, the escapes and the kidnapping. *See* Cal. Penal Code §§ 189, 211, 12022 (1987). The jury also found true the four charged special circumstances: robbery felony-murder with respect to both Katherine and William Chiapella, multiple-murder with respect to Katherine Chiapella and murder involving the infliction of torture with respect to William Chiapella. *See id.* § 190.2(a)(3), (a)(17)(I), (a)(18) (1987).

Penalty phase proceedings began on May 3. The prosecution did not present additional evidence in aggravation. The

defense offered testimony from two mental health experts, who testified that Crittenden had brain abnormalities. Crittenden had abnormal electrical activity in the frontal lobe region of his brain, which serves an "executive decision type of function" and judges the appropriate level of emotional response for a given situation. This condition, one expert explained, could be treated with medication, which would "quiet down" the abnormal activity and lead to "improvement in some of the dysfunctional areas." The defense also offered testimony from approximately 20 other witnesses, who remarked on Crittenden's good character and his positive role in their lives. At the conclusion of the penalty phase, the jury fixed the penalty at death.

The California Supreme Court affirmed Crittenden's conviction and sentence in December 1994. *See Crittenden I*, 885 P.2d at 895. (His initial state habeas petition had been denied three months earlier.) Crittenden filed a federal habeas petition containing both exhausted and unexhausted claims on October 18, 1996. In March 1997, the district court dismissed that petition without prejudice as a mixed petition under *Rose v. Lundy*, 455 U.S. 509 (1982). Crittenden then filed a second state habeas petition. While that was pending, Crittenden filed a federal habeas petition in April 1997 containing only his initially exhausted claims. Following the California Supreme Court's dismissal of his second state habeas petition in 1999, he amended his April 1997 federal habeas petition to include his initially unexhausted claims. In 2000, the district court granted reconsideration of its dismissal of Crittenden's October 1996 federal habeas petition. It deemed his April 1997 federal habeas petition, as amended in 1999, filed *nunc pro tunc* in October 1996.

The district court directed the magistrate judge to hold an evidentiary hearing on Crittenden's *Batson* and juror misconduct claims. Following a December 2002 hearing before the magistrate judge, and after reviewing de novo the magistrate judge's findings and recommendations, the district court

denied Crittenden's federal habeas petition in its entirety in February 2005. The district court subsequently denied Critten-den's motion to amend the judgment, but modified its analysis of his shackling claim to account for an intervening decision of the United States Supreme Court. Crittenden immediately filed a timely notice of appeal. The district court granted a certificate of appealability for all claims advanced in this appeal.

## STANDARD OF REVIEW

Even giving Crittenden the benefit of the district court's *nunc pro tunc* filing order, his federal habeas petition was not "pending" before April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, federal habeas review is governed in the first instance by AEDPA's highly deferential standard of review. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

We review the state court's last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *see also Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003). Under AEDPA, a petitioner is entitled to federal habeas relief only if he can show that the state court's adjudication of his claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a deci-sion that was based on an unreasonable determination of the facts in light of the evidence presented in the state court pro-ceeding. 28 U.S.C. § 2254(d). "The state court's application of clearly established law must be objectively unreasonable," not just incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). We presume the state court's factual findings to be correct, a presumption the petitioner has the burden of rebutting by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

We review de novo the district court's denial of habeas relief, *see Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir. 2000) (en banc), as well as its grant of summary judgment, *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). We review de novo the district court's legal determinations, *see Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002), including whether the district court properly applied AEDPA's standards, *see Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

## DISCUSSION

## I. *Batson* Claim

Crittenden is African-American. The victims were a white couple in their late sixties. Crittenden contends that the prosecutor's peremptory challenge of the only African-American prospective juror was on account of her race in violation of the Equal Protection Clause. *See Batson v. Kentucky*, 476 U.S. 79 (1986). We affirm the district court's conclusion that the California Supreme Court's resolution of Crittenden's *Batson* claim was contrary to clearly established federal law under AEDPA. We also affirm its conclusions at *Batson*'s first and second steps respectively that Crittenden made a prima facie showing of discrimination and that the state carried its burden of articulating a race-neutral justification for the peremptory strike. On *Batson*'s third step, however, we vacate the district court's decision and remand for further proceedings in light of the standard set forth in *Cook v. LaMarque*, 593 F.3d 810.

## A.

Before voir dire, prospective jurors completed a questionnaire asking them about their background and beliefs, including their feelings about the death penalty. Ms. Casey, the only African-American prospective juror, noted on her questionnaire "I don't like to see anyone put to death." During voir dire, Ms. Casey said she was "against death — being put to

death" and "against killing people." She said she thought her feelings concerning the death penalty would not cause her to vote against a first degree murder conviction or special circumstances if proven. She later stated, however, that she did not know whether her feelings about the death penalty might impair her ability to fairly evaluate all of the evidence and make a decision regarding the death penalty.

After questioning Ms. Casey, the prosecutor challenged her for cause "based upon her answer that she doesn't believe in the death penalty." The trial court immediately denied the challenge without explanation.

Several days later the exercise of peremptory challenges began. The prosecutor used his fifteenth peremptory challenge to remove Ms. Casey from the jury. Crittenden's counsel moved for a mistrial based on *People v. Wheeler*, 583 P.2d 748 (Cal. 1978), and filed a lengthy motion asserting that striking Ms. Casey was race-based.[2]

During a short recess, the trial court took Crittenden's *Wheeler* motion under submission and suggested that jury selection continue because, if the court ultimately granted the motion, the court would simply discharge the jury that had been selected to that point. Ms. Clark, a white woman, was the next juror placed in the jury box. She was not challenged. The defense and the prosecution each made three additional challenges. At that point, 11 jurors were seated in the jury box, including Ms. Clark. The prosecution had used 18 of its peremptory challenges and had eight remaining; the defense had used 17 and had nine remaining. The court then excused

---

[2]*Wheeler* is considered the California procedural equivalent of *Batson*, 476 U.S. 79. *See Paulino v. Castro (Paulino I)*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004). Crittenden preserved his federal constitutional claim because a *Wheeler* motion serves as an implicit *Batson* objection. *See Boyd v. Newland*, 467 F.3d 1139, 1142 n.2 (9th Cir. 2006); *People v. Yeoman*, 72 P.3d 1166, 1187 (Cal. 2003).

the jury and heard argument on the *Wheeler* motion. It noted that it had read the motion and accompanying documents submitted by the defense counsel and reviewed the transcript of the voir dire.

The defense argued it had made a prima facie case of discriminatory purpose: Ms. Casey was the only African-American prospective juror, she was a solid member of the community in terms of demographic factors and the prosecutor had used only "desultory" voir dire in examining Ms. Casey. The prosecutor did not comment on the prima facie case issue. The court denied the motion, stating:

> I'm denying the motion, gentlemen. And I do not find a prima facie case.
>
> I realize that I could go into this matter further by announcing that there is a prima facie case, and receive the explanation of the Prosecutor.
>
> But I choose not to, because of the fact that I don't believe that there is a prima facie case.
>
> My notes at the time that we interviewed this juror — and my impressions — revealed that at the very time that we interviewed Ms. Casey, my exact quotation in my notes is: "This is a case where a *Wheeler* motion would be inappropriate, because of the fact that she is indecisive and cannot guarantee that she would vote a certain way."
>
> And in my language that does not mean that, that would vote a certain way, based on the facts. But that she couldn't decide whether or not she would be able to follow the law.
>
> That is reflected in her transcript, as well.

> And, frankly, I do not see, because of this it would be difficult to establish a pattern — and I would put pattern in quotes of — of challenges.

> Because there is only Ms. Casey, who is black, on the jury panel. But there are abundant other reasons why I would have expected a peremptory challenge on this particular matter. And, as such, her wrestling with these issues indicated to me that; although a cause challenge was certainly not called for, that a peremptory challenge was going to be expected in any event.

> I don't think that a prima facie case has been made out for those reasons. And for that reason, I deny it. For those reasons that I have stated, as well as the reasons that will apply throughout the record in the actual transcript of her record; the motion is denied.

By the conclusion of jury selection, the prosecutor exercised all 26 of his peremptory challenges. Most of the jurors he peremptorily challenged were equally disinclined from a philosophical standpoint to impose capital punishment as Ms. Casey or more so, although some of the challenged jurors appeared more inclined to impose the death penalty.

On direct appeal, the California Supreme Court rejected Crittenden's *Batson* claim. In explaining the requirements for establishing a prima facie case, the court stated that the "moving party must show a *strong likelihood* that such persons are being challenged because of group association." *Crittenden I*, 885 P.2d at 902 (emphasis added) (internal quotation marks omitted). The California Supreme Court concluded that the record supported the trial court's finding that Crittenden failed to make a prima facie showing that Ms. Casey was excluded on the basis of race. *Id.* at 905.

In his federal habeas petition, Crittenden claimed that this decision was erroneous. Subsequently, the district court

ordered an evidentiary hearing on Crittenden's *Batson* claim, directing the magistrate judge to determine under the second and third steps of *Batson* whether there was a *Batson* violation in the trial court.

The prosecutor was deposed before the evidentiary hearing. He said 14 years had elapsed since the jury selection and he had no independent recollection of it or the bases of his for-cause and peremptory challenges of Ms. Casey. Noting that his response was not based on memory, but rather his views after reviewing the record, he said that he used a peremptory challenge to remove Ms. Casey from the jury because she opposed the death penalty, did not want to sit on the jury and had transportation problems. He said he "was looking for strong, independent jurors that [he] thought would be able to unequivocally vote for the death penalty" and "she was not that juror." He also noted that he could not recall what his personal observations were, but that such observations are "very important in the selection of a jury" and "the transcript of Ms. Casey's voir dire . . . [had] dashes and spaces, so there must have been pauses" and she thus could have "appeared . . . equivocal."

At the evidentiary hearing the prosecutor testified, after reviewing transcripts and questionnaires, that he made three challenges for cause before challenging Ms. Casey on the basis of objections to the death penalty and that when he challenged her for cause he believed it would be granted because "[she] did not believe in the death penalty. She stated that she hated death and did not believe in the death penalty." He answered again the question of why he exercised a peremptory to remove her:

> Q   [T]oday, do you have an independent recollection why you excused [Ms.] Casey?
>
> A   An independent recollection?

Q    Independent recollection?

A    Other than what I reviewed in questionnaires and that sort of thing? It's just a philosophical question to me. I can tell you why I did it, but I can't tell you that those were the exact words I had in my mind when I did it.

Q    First of all, what — how do you interpret the question, do you remember?

A    Well, at the deposition, counsel for the defense were asking me, do you have an independent recollection now of what you were thinking at the time that you did something. That's a way of looking at it. No. I can't tell you what exactly I was thinking then.

   I've read the transcripts. I've read the questionnaire. I know myself. So, I can see what I did, and I see explanations of why I did it.

Q    Do you have an answer today to the question why did you excuse [Ms.] Casey?

A    Sure. She was anti-death penalty.

Q    And was there —

The court:  And you have based that answer on interpreting your notes?

A    The questionnaire and the — and my notes, and reading the transcript.

Finally, he explained his rating system for prospective jurors in the jury selection process. After voir dire he would make a notation at the bottom corner of the questionnaire, either a

series of X's or checkmarks to indicate his preference and its strength or his hesitation about accepting the prospective juror. The notations referred to whether he thought the prospective juror was favorable or unfavorable to the prosecution, with significant focus on the death penalty issue.

The prosecutor's copies of the juror questionnaires for Ms. Casey and other jurors were entered into evidence. The question about the juror's death penalty views was number 56 on the questionnaire, and, before voir dire began, the prosecutor wrote "56" on the front page of Ms. Casey's questionnaire. Additionally, his copy of Ms. Casey's questionnaire reflected that, at the conclusion of Ms. Casey's voir dire, the prosecutor gave her a rating of "XXXX," the most negative rating within his system, and wrote "DP," "transport problems" and "can't say if would set aside" on her questionnaire.

At step two of the *Batson* inquiry, the magistrate judge found the prosecutor was "credible and forthright in his factual testimony relating his non-recollection and recollections with respect to his systemic practices and the rating system in this case." Further, he found the prosecutor "was not purposeful in his non-recollection, nor was he creating recollections where he really had none." The magistrate judge then concluded that the prosecutor's articulation of a race-neutral reason could be "reconstructed" based on circumstantial evidence. Relying on (1) Ms. Casey's answers to the juror questionnaire, (2) the prosecutor's pre-voir dire notation of his concern about her response to the death penalty question 56 on the questionnaire, (3) the voir dire transcript and (4) the prosecutor's post-voir dire notations rating her as "XXXX," the magistrate judge found the circumstantial evidence was sufficiently specific to discern with confidence that the prosecutor would have articulated a race-neutral justification for his peremptory challenge had he been asked to do so — namely Ms. Casey's "reluctance or indecision to impose the death penalty" — and therefore that the state had carried its burden at *Batson*'s step two.

At step three, the magistrate judge found "race played some part in the prosecutor's evaluation of Ms. Casey, but was not 'the real reason' or effective reason for her being struck from the jury." The magistrate judge reached this conclusion through a comparative juror analysis and found that the prosecutor's extremely negative "XXXX" rating of Ms. Casey could not be explained by her views on the death penalty alone because other jurors who expressed similar views on the death penalty received less negative ratings. The magistrate judge concluded, however, that Ms. Casey's race was not the actual reason for her strike, because "prosecutor Flanagan had a good reason to exercise his challenge which outweighed the bad."

The district court adopted the magistrate judge's post-evidentiary hearing findings and recommendations, with some modifications. In pertinent part, it found that race-neutral factors could not fully "justify Casey's XXXX rating, especially when compared to other venire members," and that "race played a significant part in the prosecutor's decision to remove Casey." Like the magistrate judge, however, the district court further found that "a valid and well-supported race-neutral reason exists for Casey's challenge" and the court therefore "c[ould] not find the 'real' or 'motivating' reason for Casey's removal was her race." It therefore denied Crittenden's *Batson* claim.

## B.

**[1]** The California Supreme Court's decision with respect to Crittenden's *Batson* claim was contrary to clearly established federal law under AEDPA because, in affirming the trial court's ruling, it required Crittenden to show a "strong likelihood" that the prosecutor's challenge had been racially motivated. *See Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) ("[U]se of the wrong legal rule or framework . . . constitute[s] error under the 'contrary to' prong of § 2254(d)(1)."). The "strong likelihood" standard impermiss-

ibly places on the defendant a more onerous burden of proof than is permitted by *Batson*'s standard of "rais[ing] an inference" of discriminatory purpose. *See Johnson v. California*, 545 U.S. 162, 169, 170-73 (2005); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000). We thus must "resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *see also Williams v. Taylor*, 529 U.S. 362, 406 (2000); *Wade,* 202 F.3d at 1197. In doing so, we review de novo questions of law and mixed questions of law and fact. *See Williams*, 529 U.S. at 400; *Frantz*, 533 F.3d at 739. Factual findings and credibility determinations that were not made by the trial court but were made by the district court after an evidentiary hearing are reviewed for clear error. *See Lambert*, 393 F.3d at 964.

## C.

*Batson* established a three-step process for adjudicating a claim that a peremptory challenge was based on race:

> [A] defendant [can] make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging . . . jurors within an arguably targeted class. Although there may be "any number of bases on which a prosecutor [might] believe that it is desirable to strike a juror who is not excusable for cause . . . , the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e]." "The trial court will have the duty to determine if the defendant has established purposeful discrimination."

*Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) ("*Miller-El II*") (quoting *Batson*, 476 U.S. at 94, 96-98, n.20) (internal cita-

tions omitted). "[T]he burden to prove purposeful discrimination is always on the opponent of the challenge," so the first two steps represent "mere burdens of production" that aid the court in determining, at step three, whether the petitioner has satisfied the ultimate burden of persuasion. *Yee v. Duncan*, 463 F.3d 893, 898 (9th Cir. 2006). Petitioner's burden of proof at step three is a preponderance of the evidence. *See Paulino v. Harrison*, 542 F.3d 692, 702 (9th Cir. 2008) ("*Paulino II*").

## 1.   *Prima Facie Case*

**[2]** Under *Batson*'s first step, the defendant must establish a prima facie case of purposeful discrimination. *See Batson*, 476 U.S. at 93-94. He must show that (1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raises an inference that the strike was on account of race. *Id.* at 96; *see Johnson*, 545 U.S. at 169; *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006). The first and second elements of the test are met here, because the prospective juror is African-American and the prosecutor used a peremptory strike to remove the prospective juror. Thus, only the third element of the prima facie case is at issue — whether the California state court erred in failing to recognize that the totality of the circumstances raised an inference of racial motivation.

The Supreme Court clarified the threshold requirements of *Batson*'s step one in *Johnson*. There, the prosecutor used three of his 12 peremptory challenges to strike all of the African-American prospective jurors from the jury pool. *See Johnson*, 545 U.S. at 164. The defense counsel made *Wheeler/Batson* motions after the second and third strikes of African-American prospective jurors. After the third strike, the trial court warned the prosecutor that the situation was "very close," but found the defense had not established a

prima facie case. *Id.* at 165. The Supreme Court reversed, clarifying that the first step was not an onerous burden:

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

*Id*. at 170. On the same day, the Supreme Court also decided *Miller-El II*, using comparative juror analysis to determine whether the prosecution was motivated by racial bias in exercising its peremptory strikes. *See Miller-El II*, 545 U.S. at 241.

With this precedent in mind, and in light of the "totality of the relevant facts," *Batson*, 476 U.S. at 94, we conclude that Crittenden produced evidence sufficient to draw an inference that discrimination occurred. Several considerations lead to this conclusion.

**[3]** As an initial matter, the prosecutor's use of a peremptory strike against the only African-American prospective juror is a relevant consideration, although it does not by itself raise an inference of discrimination. We have previously stated that "[a] pattern of striking panel members from a cognizable racial group is probative of discriminatory intent, but a prima facie case does not require a pattern because 'the Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009) (*quoting United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)); *see also Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). We have also

recognized that, "[t]he fact that the juror was the one Black member of the venire does not, in itself, raise an inference of discrimination" because "it is not per se unconstitutional, without more, to strike one or more Blacks from the jury." *Vasquez-Lopez*, 22 F.3d at 902; *see also Collins*, 551 F.3d at 920. Here we have that additional evidence of discrimination by way of comparative juror analysis.

**[4]** Comparative juror analysis is an established tool at step three of the *Batson* analysis for determining whether facially race-neutral reasons are a pretext for discrimination, *see, e.g.*, *Miller-El II*, 545 U.S. at 241; *see also Boyd*, 467 F.3d at 1149; *Kesser v. Cambra*, 465 F.3d 351, 360 n.2 (9th Cir. 2006) (en banc). In addition, comparative juror analysis may be employed at step one to determine whether the petitioner has established a prima facie case of discrimination. *Boyd*, 467 F.3d at 1149. Crittenden argues that a comparison of Ms. Casey with other jurors — particularly Ms. Clark, the white juror who took her place on the jury — provides evidence sufficient to permit a judge to draw an inference that discrimination occurred.

**[5]** The prosecutor rated Ms. Casey in his notation system as "XXXX," indicating a very undesirable juror in his view, and Ms. Clark as "✓✓✓," indicating a fairly desirable juror. They were demographically similar apart from race, however, and a comparison of their voir dire responses shows some similarities to the extent that they both expressed general opposition to the death penalty and some hesitancy about its imposition.[3] We therefore agree that the wide difference

---

[3]There were some differences too. For example, whereas Ms. Casey expressed her opposition to the death penalty as a general feeling, Ms. Clark cited her religious beliefs as a strong reason for opposing it. Ms. Clark said she was Catholic and was raised to believe she could not take somebody's life, but she also later said she would be able to follow the law. In contrast, Ms. Casey said: "I don't believe in death penalty. And I don't believe in nobody killing anybody either. So I guess — I don't know

between the prosecutor's rating of Ms. Casey and Ms. Clark is evidence from which an inference of discrimination could have been drawn for the purpose of determining whether Crittenden established a prima facie case.

A comparative analysis between Ms. Casey and juror Krueger, a white woman who received a rating of " ✓✓½✓ " from the prosecutor, adds to the evidence from which such an inference could be drawn. Ms. Casey and Ms. Krueger were demographically similar in most respects apart from race. Like Ms. Casey, Ms. Krueger noted on her questionnaire that she was against the death penalty. As was the case with Ms. Clark, although there were some differences in voir dire responses generally, given the demographic similarity and somewhat analogous views on the death penalty, the marked difference in the prosecutor's ratings buttresses Crittenden's prima facie case.

[6] In addition to the above considerations, the circumstances of the prosecutor's for-cause challenge of Ms. Casey also add to the evidence from which an inference of improper discrimination could be drawn. The prosecutor said he challenged her for cause because she did not believe in the death penalty; however, it was well established law at the time that

_____

what you would say — in between or whatever." On balance, the transcript shows that Ms. Clark was clearer than Ms. Casey about her ability to vote for a death verdict and to be decisive, though at times both expressed hesitancy or uncertainty. In particular, although Ms. Clark voiced some uncertainty about imposing the death penalty, she also expressly claimed to be a decisive person. She said, "I have never been in that predicament. I am not quite sure how I would react. I feel the person should be punished for their crime. Maybe I could." But she also said she was "a pretty decisive person" and that she would be comfortable in making a decision about imposing the death penalty. Ms. Casey, by contrast, provided no such reassurance about her ability to be decisive. In addition to the statement quoted above, she said she felt "not good" about the prospect of serving as a juror because "[i]t is scary" and she had never done it before.

challenges for cause based on a juror's general objections to the death penalty were improper. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

**[7]** In light of the above considerations, we conclude that Crittenden made a prima facie showing sufficient for the first step of *Batson*.[4] We emphasize that Crittenden's burden at this step was not onerous. Concluding that he produced "evidence sufficient to permit the trial judge to draw an inference that discrimination . . . occurred," *Johnson*, 545 U.S. at 170, does not amount to a conclusion that discrimination actually occurred. That determination is left to the third step of the *Batson* analysis.

### 2. *Race-Neutral Explanation*

**[8]** After the opponent of the peremptory strike makes a prima facie case raising an inference of discrimination, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). The explanation

---

[4]Crittenden makes two other arguments that do not add significantly to his prima facie case. First, Crittenden contends that the prosecutor disparately questioned Ms. Casey by referring to the "gas chamber" in questioning her and not other prospective jurors. The prosecutor's unadorned use of the term "gas chamber" was not graphic, however, and it did not stand out from the rest of the questioning. *Cf. Miller-El II*, 545 U.S. at 256. The defense itself referred to the gas chamber when questioning another prospective juror. Moreover, although the prosecutor did not mention the gas chamber with other prospective jurors, he did ask at least equally pointed questions about applying the death penalty, such as whether they could vote to impose the death penalty against a young man the same age as a juror's grandchildren and whether a juror could himself sign the verdict of death. Second, Crittenden notes that the same prosecutor removed the only African-American panelist in a jury venire in a different capital case tried the year before his, urging this as evidence of the prosecutor's discriminatory motive in his case. The probative value of this information is weak because it is a single instance and the trial court denied the *Batson* objection in that case.

does not have to be "persuasive, or even plausible," because "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 768. As we explained in *Yee v. Duncan*:

> [S]tep two is an opportunity for the prosecution to explain the real reason for her actions. A failure to satisfy this burden to produce — for whatever reason — becomes evidence that is added to the inference of discrimination raised by the prima facie showing, but it does not end the inquiry. The trial court then moves on to step three where it considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights.

463 F.3d 893, 899 (9th Cir. 2006).

In the usual case, the *Batson* analysis takes place during or shortly after jury selection. In those cases, the prosecutor offers a contemporaneous explanation for the strike at step two. Where time has passed since the jury selection, the prosecutor may offer an explanation based on his present recollection of his reasons for striking the juror. Where, as here, time has passed and the prosecutor no longer has a present recollection of his or her reasons for striking the juror, the state may offer an explanation based on circumstantial evidence. *See Paulino II*, 542 F.3d at 700 ("Evidence of a prosecutor's actual reasons may be direct or circumstantial, but mere speculation is insufficient."). When this occurs, we say that the state has "reconstructed" the prosecutor's reasons for striking the juror. During reconstruction, the state may rely on any relevant evidence, such as jury questionnaires, the prosecutor's notes or testimony of the prosecutor.

As we explained in *Paulino II*, the court may reject a reconstructed articulation as mere "speculation" or accept it as properly based on relevant circumstantial evidence. *See id.*

("[T]he district court did not err in concluding that the specu-
lative reasons offered by the prosecutor did not constitute cir-
cumstantial evidence of her actual reasons."). But regardless
of how the state offers its race-neutral justification, it is not
the task of the district court at step two to assess the truth of
the explanation. That is part of the step three analysis. Nor is
it the district court's role to conduct its own reconstruction,
based on the circumstantial evidence, of what the prosecutor
would have said. At step two, the court's role is limited to
determining whether the state has met its burden of produc-
tion at all.[5]

**[9]** In this case, the government took advantage of its step
two opportunity by offering relevant circumstantial evidence
suggesting several race-neutral reasons for removing Ms.
Casey from the jury. On this basis, the district court properly
concluded that the state satisfied its burden of production at
step two, which merely required it to show that the prosecutor
would have articulated some race-neutral justification if
asked.

### 3. *Purposeful Discrimination*

**[10]** In step three of the *Batson* inquiry, the court must
decide whether the opponent of the peremptory challenge has
carried his burden of proving purposeful discrimination by a
preponderance of the evidence. *See Batson*, 476 U.S. at 98;
*Cook v. LaMarque*, 593 F.3d at 815 (to show "purposeful dis-

---

[5]At step three of the *Batson* analysis, the district court considers the
totality of the evidence and determines whether or not the plaintiff has
proved purposeful racial discrimination by a preponderance of the evi-
dence. There, the court should consider all of the relevant evidence,
including the court's assessment of the prosecutor's credibility. Evidence
that the race-neutral justifications offered by the state at step two are
unworthy of credence supports a finding of race discrimination. *See Sny-
der*, 552 U.S. 472, 485 (2008) ("The prosecution's proffer of this pretex-
tual explanation naturally gives rise to an inference of discriminatory
intent.").

crimination at *Batson*'s third step" the petitioner must establish that "race was a substantial motivating factor").

**[11]** Acting prior to our decision in *Cook*, the district court appears to have conducted its step three analysis by asking whether race played a "significant" part in the decision to issue the peremptory strike, and if so whether the defendant could prove under a mixed motives analysis that the strike would have issued even if race had played no role. *Cook* framed the first inquiry in different terms and eliminated the second. As *Cook* explains, the proper analysis at *Batson*'s step three is whether the peremptory strike was "motivated in substantial part" by race. *Id.* If it was so motivated, the petition is to be granted regardless of whether the strike would have issued if race had played no role. *Id.* ("[W]e reject the . . . mixed-motives analysis, and limit our inquiry to whether the prosecutor was 'motivated in substantial part by discriminatory intent.' ").

**[12]** As the district court was operating under the erroneous impression that the *Batson* inquiry required an additional step — *i.e.*, mixed motives analysis — we remand to give the court an opportunity to apply the proper standard, as articulated in *Cook*. We do not foreclose the possibility that the district court could conclude on remand that its previous finding that "race played a significant part in the prosecutor's decision to remove Casey" was sufficient under *Cook* to establish a *Batson* violation.[6] Nonetheless, the district court did not have the benefit of *Cook* when it last addressed the question, and its evaluation of the significance of the race factor in the decision to strike Ms. Casey could have been informed by its

---

[6]Both the Supreme Court and this court have used the words "significant" and "substantial" interchangeably in analogous contexts. *See*, *e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 796-800 (1989); *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 n.3 (9th Cir. 2009); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023-24 (9th Cir. 2009); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007).

understanding that there would be another analytic step focusing on the several race-neutral justifications offered. We therefore leave it to the district court to make a step three determination in the first instance, unconstrained by its prior findings under the pre-*Cook* standard.

## II. Ineffective Assistance of Counsel

Crittenden next argues that he did not receive constitutionally effective assistance from his trial counsel, Dennis Hoptowit and Donald Blake, because they (1) delayed neuropsychological testing until it was too late to present a mental state defense in the guilt phase; (2) did not conduct an adequate investigation into mitigating evidence, which would have revealed that Crittenden had (i) an organic mood disorder with bipolar features and (ii) a history of behavioral problems and childhood abuse; and (3) ineffectually presented social background and mental health evidence in the penalty phase. We affirm the district court's denial of federal habeas relief because the California Supreme Court's rejection of Crittenden's ineffective assistance of counsel ("IAC") claim was not an objectively unreasonable application of clearly established law.[7]

---

[7]Because additional factual development would not enable Crittenden to state a colorable claim, we also conclude that the district court did not abuse its discretion by denying Crittenden's request for investigative funds under former 21 U.S.C. § 848(q)(4)(B) and (q)(9), *see Bonin v. Calderon*, 59 F.3d 815, 837 (9th Cir. 1995), discovery under Rule 6(a) of the Rules Governing Section 2254 Cases, *see Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999), discovery under Rule 56(f) of the Federal Rules of Civil Procedure, *see Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004), and an evidentiary hearing, *see Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004). For similar reasons, we do not reach the State's argument that Crittenden failed to exercise sufficient diligence in developing the factual basis of his claim in state court proceedings, barring him from obtaining a federal evidentiary hearing. *See generally* 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

## A.   Application of AEDPA

We begin by ascertaining the appropriate standard of review. In relevant part, the California Supreme Court's order denying Crittenden's first state habeas petition stated:

> The petition for writ of habeas corpus *is denied in its entirety*.

> Petitioner's claim that trial counsel rendered ineffective assistance by his delay in seeking neuropsychological testing is denied on the merits.

(Emphasis added.) We reject Crittenden's contention that the California Supreme Court adjudicated on the merits only the "delay in seeking neuropsychological testing" aspect of his IAC claim.

A "postcard" denial by the California Supreme Court is a denial on the merits. *See Harris v. Superior Court*, 500 F.2d 1124, 1128 (9th Cir. 1974) (en banc); *see also Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008) ("[U]nless a court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible."). The first sentence of the California Supreme Court's order thus constitutes an adjudication on the merits of Crittenden's state habeas petition — necessarily including all aspects of his IAC claim — in its entirety. We therefore accord AEDPA deference to the California Supreme Court's disposition of those claims. *See Gonzalez v. Brown*, 585 F.3d 1202, 1206 (9th Cir. 2009); *see also* 28 U.S.C. § 2254(d). Because the state court's decision was not reasoned, however, we "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (internal quotation marks omitted).

### B.    Guilt Phase

Crittenden contends that trial counsel did not timely investigate his mental health and therefore failed to present a mental state defense during the guilt phase that might have won him acquittal of first-degree murder with special circumstances, thereby removing him from death eligibility under California law. *See* Cal. Penal Code § 190.2(a) (1987) (defining special circumstances). To prevail on a claim of ineffective assistance, the petitioner must show that trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Without resolving whether trial counsel's guilt-phase investigation was constitutionally deficient, we hold that it is not objectively unreasonable to conclude that Crittenden has not established prejudice. Consequently, Crittenden is not entitled to federal habeas relief.

For background, we summarize trial counsel's investigative efforts. Hoptowit entered his appearance in January 1987. He obtained from Crittenden's mother some "materials and information regarding prior psychological treatment and counseling received by Mr. Crittenden." Recognizing that the physical evidence against Crittenden was strong, he "assumed from the beginning that there would be a penalty phase" and "[r]elatively early on . . . made the decision to have a complete psychological/neurological workup performed." The trial court approved funds for psychological testing in February 1987, but trial counsel did not begin testing until October 1988, one month before jury selection began. On October 21, Dr. Bruce Kaldor, a psychiatrist, met with Crittenden for four hours, took a medical history and administered an alcohol abuse screening test. A week later, Dr. Michael Erickson, a clinical psychologist, met with Crittenden for six hours, completed a life history survey and performed six psychological tests. Drs. Kaldor and Erickson concluded that Crittenden had an antisocial personality disorder. Neither found any indication of organic brain impairment. Dr. Kaldor recommended,

however, that further neurological testing be conducted because there were "certain organic mental conditions which are associated with aggressive behavior and poor impulse control." Dr. John Seals subsequently performed electroen-cephalogram ("EEG") and Brain Electrical Activity Mapping ("BEAM") testing on February 24, 1989, three weeks before the guilt phase began. Dr. Seals concluded that Crittenden suffered from an organic brain defect in the frontal lobe region. On March 2, Hoptowit consulted with Dr. Robert Bittle, a psychiatrist, to review Crittenden's "complete medical/psychological file, which at that time included his childhood records," and the reports of Drs. Kaldor, Erickson and Seals. Dr. Bittle never interviewed Crittenden personally, but averred that he became "quite familiar" with the case "based upon his review of [Crittenden's] file and discussions with his defense counsel." On March 13, Dr. Arthur Dublin performed an MRI of Crittenden's brain and found no abnormalities. None of these medical experts testified during the guilt phase, which began the next day.

[13] We do not condone unnecessary delay in starting the investigative process. Fully cognizant of the importance of a "prompt and timely examination," trial counsel nonetheless waited 21 months between obtaining funds for psychological testing and arranging for Crittenden to be examined by Drs. Kaldor and Erickson.[8] Even then, trial counsel took three more months to conduct the additional neurological testing recommended by Dr. Kaldor. *See Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (criticizing counsel for "delaying for over ten months in following the explicit recommendations of two mental health experts"). Nonetheless, even

---

[8]Hoptowit asserted that he could not find a local doctor who was willing to perform the necessary testing, because William Chiapella and his son were also doctors. He made no attempt to locate an expert from outside the Chico area until October 1988, when he and Blake "realized that . . . [the] trial date was fast approach[ing] and [they] had not yet explored issues relating to Mr. Crittenden's mental health."

assuming that trial counsel's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, we reject Crittenden's guilt-phase IAC claim. The mental state defense he now contends should have been offered is no more credible than the flimsy alibi defense actually put on at trial. *Cf. Crittenden I*, 885 P.2d at 900-01.

Crittenden asserts that trial counsel should have "concede[d] that [he] committed the killings, but . . . contest[ed] whether he acted with the requisite" intent to kill the Chiapellas. He claims that he intended only to "enter[ ] the Chiapella residence to commit a burglary" and was surprised by the Chiapellas' unexpected return, whereupon his brain abnormalities prevented him from controlling himself and he killed the Chiapellas. Dr. Bittle averred that Crittenden, "subjected to a highly stressful situation, might very well [have] . . . engage[d] in impulsive, violent behavior." The killings "might, therefore, be more the result of an inability to control certain impulses than deliberate, thought-out planning or premeditation." Dr. George Woods, a psychiatrist who examined Crittenden after the trial, opined that Crittenden "was acting under extreme stress" at the time of the killings and "most likely did not form the requisite intent to kill the Chiapellas." The crimes, he explained, were instead the result of an "explosion of violence." Presented with this testimony, Crittenden argues that the jury may have found reasonable doubt in whether the killing was "deliberate and premeditated," and so acquitted him of first-degree murder with special circumstances.[9]

---

[9]The State erroneously asserts that "[t]he guilt phase defense Crittenden now argues that [trial counsel] should have presented is tantamount to a concession of first degree felony murder and the special circumstance of multiple murder." Its argument fails to recognize that the Chiapellas' killings took place during the so-called "window period" between *Carlos v. Superior Court*, 672 P.2d 862 (Cal. Dec. 12, 1983), and *People v. Anderson*, 742 P.2d 1306 (Cal. Oct. 13, 1987), during which the California Supreme Court interpreted the death penalty statute to require "an intent to kill in all instances, even when the defendant was the actual killer." *People v. Rogers*, 141 P.3d 136, 183 (Cal. 2006); *see also Duncan v.*

**[14]** This argument is not persuasive, because the state court record refutes Crittenden's claim that he suffered prejudice. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (explaining that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record") (quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (internal quotation marks omitted)). Under California law as it then stood, evidence of mental illness was "admissible solely on the issue of whether or not the accused *actually formed* a required specific intent, premeditated, [or] deliberated." *People v. Saille*, 820 P.2d 588, 593 (Cal. 1991) (quoting Cal. Penal Code § 28(a)) (emphasis added by *Saille*). Even if the jury had heard a mental state defense, the overwhelming evidence of deliberation and premeditation presented at trial would have contradicted Crittenden's suggestion that he did not kill the Chiapellas with the requisite intent. He is unable, therefore, to show that trial counsel's alleged deficient performance undermined the reliability of the jury's guilty verdict. *See Strickland*, 466 U.S. at 694.

The facts established in the state court proceedings demonstrate this.[10] In October 1986, the Chiapellas hired Crittenden to perform yard work. *See Crittenden I*, 885 P.2d at 896. On January 11, 1987, Crittenden called his landlord to reschedule an overdue rent payment, advising her that he would be able

*Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (explaining that California law required a finding that the defendant intended that the victim be killed at the time of the defendant's trial, held in 1986). Therefore, if the jury had accepted Crittenden's proposed mental state defense and found that he did not have the intent to kill, he could not have been convicted of an offense that made him eligible for the death penalty.

[10]Assuming the California Supreme Court did not arrive at an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), that court's findings of fact are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Perez v. Rosario*, 459 F.3d 943, 950 (9th Cir. 2006). Crittenden has failed to overcome that presumption.

to "pay it all" by January 14. *Id.* On the morning of the kill-ings, January 13, Crittenden borrowed a knife from his room-mate, telling him that he was using it to repair his stereo and would return it the following day.[11] *See id.* William Chiapella was discovered gagged with a sock, "lying on the rug, his hands tied behind his back to a desk chair, . . . his head and face covered by a pillowcase." *Id.* at 898. He had been dragged from the Chiapellas' study to their bedroom, where he was stabbed and bludgeoned 13 times. *See id.* Katherine Chiapella was discovered "lying on her back, her head and face covered by a blanket. Her mouth had been gagged and her hands tied behind her back with three separate bindings" fashioned from the same, strawberry-patterned cloth as a matching set of sheets and pillowcases left in Crittenden's apartment by his landlord. *Id.* at 897. She had been stabbed at least two times and sustained blunt-object injuries to the head and face. *See id.* Crittenden induced Katherine Chiapella to write him a check for $3,000, as well as two unsigned checks made out for cash. *See id.* at 896, 898. (Later that day, Crittenden asked his wife to "prepare a budget based upon assets of $3,000." *Id.* at 896.) The phrase "just the beginning" was written in lipstick on the mirrors in two different bath-rooms. *Id.* at 897.

Reviewing the evidence in a post-trial motion to modify the sentence, the trial court commented on the planning and sophistication displayed by the murders: Crittenden "arrived at [his choice of victims] by some degree of planning and cal-culation," "armed himself in advance and prepared his crimes by bringing with him a pillow case from his own home" and then "rendered [his victims] totally defenseless and at [his] absolute mercy" before killing them. The California Supreme Court agreed, observing that "the totality of the circumstances of the crime amply demonstrates defendant's intent to torture

---

[11]Crittenden posits that there is some uncertainty about whether this knife was actually used during the killings. This misses the point: Critten-den's borrowing of the knife *itself* evinced planning and deliberation.

William and suggests neither an 'explosion of violence,' nor, in the case of the nonfatal wounds, inadvertent infliction." *Id.* at 920. "The careful, even excessive, binding and gagging of the victims, involving a considerable expenditure of time and effort, . . . is inconsistent with the theory that an 'explosion of violence' occurred." *Id.*

In the face of this evidence, it is not objectively unreasonable to conclude that the mental state defense presently urged by Crittenden had no "reasonable probability" of altering the jury's verdict. *Strickland*, 466 U.S. at 694. Neither *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005), nor *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), directs a different result. Daniels, unlike Crittenden, committed his crime before California abolished the diminished mental capacity defense in 1982 and therefore could have avoided a first-degree murder conviction even in the face of "[s]ubstantial evidence supporting . . . premeditation and deliberation." *Daniels*, 538 F.3d at 1207 & n.29 (alterations in original) (quoting *People v. Cruz*, 605 P.2d 830, 835 (Cal. 1980)).

Crittenden's reliance on *Jennings* is also unconvincing. Jennings stabbed the victim 14 times in the course of a rape and apparent robbery, and bound the victim's neck and ankles. *See* 290 F.3d at 1008. Reviewing the matter de novo because the defendant filed his habeas petition before AEDPA's effective date, *see id.* at 1011, we held that it was reasonably probable that the jury, apprised of evidence that Jennings suffered from "schizoaffective disorder and amphetamine psychosis," might have found a "reasonable doubt as to [his] ability to form the intent required for a first degree murder conviction," *id.* at 1017, 1019. By contrast, Crittenden's crimes reflected a qualitatively higher degree of deliberation and planning, as evidenced by his extensive preparation beforehand (e.g., rescheduling an overdue rent payment and procuring a knife and binding materials) and his goal-oriented behavior throughout (e.g., methodically incapacitating the

Chiapellas and making Katherine Chiapella write him a check).

**[15]** Given the "ample evidence in the record to demonstrate that a mental impairment defense was wholly inconsistent with [the defendant's] actions," and therefore had no reasonable probability of avoiding a death-eligible, first-degree murder with special circumstances conviction, *Totten*, 137 F.3d at 1176; *see also Douglas v. Woodford*, 316 F.3d 1079, 1087 (9th Cir. 2003) (finding no prejudice where the evidence overwhelmingly pointed to premeditation and deliberation and it was thus not reasonably probable that the jury would have credited the defendant's mental defense had it been offered), we hold that it was not objectively unreasonable for the California Supreme Court to reject Crittenden's guilt-phase IAC subclaim.

## C. Penalty Phase

Crittenden also contends that his trial counsel conducted an inadequate investigation into his mental health and social history, and then compounded this deficiency by presenting mitigation evidence ineffectually. The California Supreme Court's rejection of these arguments does not warrant federal habeas relief under AEDPA. It is not objectively unreasonable to conclude that trial counsel's investigative efforts did not fall below *Strickland*'s standard of reasonableness and were adequate to support a strategic choice to emphasize Crittenden's positive characteristics and limit testimony about his mental health and history of behavioral problems. For that reason, we hold that Crittenden has not alleged facts stating a colorable, penalty-phase IAC claim. We do not reach *Strickland*'s prejudice prong.

### 1. *Investigation of Brain Disorder*

We first address Crittenden's argument that trial counsel's investigation was inadequate because it did not turn up evi-

dence of an organic mood disorder with bipolar features. He asserts that the factual basis for such a diagnosis — a "history of mood swings, aberrant behavior, and psychiatric treatment" — "was well-documented and readily available to trial counsel." In his youth, Crittenden had been prescribed and responded well to lithium, a standard treatment for an organic mood disorder with bipolar features. According to Dr. Woods, its "manifestations" were "readily apparent for many years" and should have been "easily discernable from a review of [Crittenden's] medical and social history." An adequate mitigation investigation would, Crittenden argues, have enabled his psychiatric experts to make that diagnosis before the penalty phase began.

**[16]** The California Supreme Court's rejection of this claim was not an objectively unreasonable application of clearly established federal law. Trial counsel's performance in the penalty phase is assessed using the "same 'clearly established' precedent of *Strickland*" that applies to all IAC claims. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003). In preparing for the sentencing phase of a capital trial, it is imperative that trial counsel undertake a diligent investigation into all reasonably available mitigating information. *See Porter v. McCollum*, 130 S. Ct. 447, 452-53 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005); *Wiggins*, 539 U.S. at 524; *Summerlin v. Schriro*, 427 F.3d 623, 630-31 (9th Cir. 2005) (en banc) (describing the "minimal type of 'objectively reasonable' investigation any competent capital defense attorney should conduct in preparing a penalty phase defense"). Counsel must conduct "reasonable investigations or . . . make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The investigation supporting counsel's decision to stop investigating must *itself* be reasonable, *see Wiggins*, 539 U.S. at 523; *Stankewitz*, 365 F.3d at 719, "evaluat[ing] the conduct from counsel's perspective at the time," *Strickland*, 466 U.S. at 689.

In addition to the mental health experts already consulted (Drs. Kaldor, Erickson, Seals, Bittle and Dublin), Crittenden's

trial counsel retained Dr. Daniel Edwards, a psychiatrist, to perform additional testing on March 26, 1989. Dr. Edwards also reviewed the results of Dr. Seals' EEG/BEAM testing. The following day, Dr. Richard Sauer performed a neurological evaluation and found no abnormalities. Crittenden's trial counsel consulted Dr. Bittle again on April 25 to discuss the upcoming penalty phase. About a week later, Dr. Edwards submitted a report concluding that Crittenden had an "Organic Brain Syndrome, Not Otherwise Specified." He wrote that a frontal lobe defect could account for significant features of Crittenden's brain dysfunction. The penalty phase began two days later.

None of the seven mental health professionals trial counsel consulted before the penalty phase diagnosed an organic mood disorder with bipolar features. After being informed by Dr. Kaldor that there were "certain organic mental conditions which are associated with aggressive behavior and poor impulse control," trial counsel explored this potential source of mitigating information. It is not disputed that the experts they retained were competent and "qualified to evaluate" Crittenden's mental impairments. *Frierson v. Woodford*, 463 F.3d 982, 991-92 (9th Cir. 2006); *see also Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9th Cir. 1999) (emphasizing that effective assistance of counsel means employing experts who are qualified to perform the investigation necessary). Trial counsel therefore fulfilled their obligation to "conduct an investigation which will allow a determination of what sort of experts to consult." *Caro*, 165 F.3d at 1226.

Their investigative duties were not then at an end, however, because in the preparing for the penalty phase, counsel must also "present [appropriate] experts with information relevant to the conclusion of the expert." *Id.* Here, Dr. Kaldor took Crittenden's medical history and reviewed some of his medical records, although not the ones describing the lithium treatment. Dr. Erickson took his life history. Neither diagnosed an organic mood disorder. Dr. Bittle reviewed Crittenden's

"complete medical/psychological file, which at that time included his childhood records," and the reports of Drs. Kaldor, Erickson and Seals. He disputed Drs. Kaldor and Erickson's conclusion that Crittenden had an antisocial personality disorder, but also did not diagnose an organic mood disorder. Dr. Dublin's MRI study found that the "structural integrity" of Crittenden's brain was within normal limits. Dr. Sauer's independent neurological evaluation turned up no abnormalities. Even with the benefit of Dr. Seals' EEG/BEAM results, as well as his own clinical evaluation, Dr. Edwards did not diagnose an organic mood disorder. None of the experts suggested that additional background information or testing was necessary before they could make an accurate evaluation of Crittenden's mental health.

[17] "At the end of the day," Crittenden's "argument turns on a latter-day battle of experts" that is insufficient to warrant federal habeas relief. *Sims v. Brown*, 425 F.3d 560, 584 (9th Cir. 2005). Dr. Woods' singular diagnosis of an organic mood disorder with bipolar features amounts to a difference in medical opinion, not a failure to investigate. *See Fields v. Brown*, 431 F.3d 1186, 1205-06 (9th Cir. 2005), *aff'd on reh'g in relevant part*, 503 F.3d 755, 783 n.24 (9th Cir. 2007) (en banc). Trial counsel alerted the mental health specialists to the possibility that Crittenden might have organic brain damage and then provided them with relevant background information.[12] *See Sims*, 425 F.3d at 585-86 (rejecting IAC claim where counsel "retained and informed well-qualified experts upon whom [counsel] could reasonably rely"); *cf. Caro*, 165 F.3d at 1227 (criticizing trial counsel for failing to provide expert with the "information necessary to make an accurate evaluation of [the defendant's] neurological system"). That none of them happened to unearth the particular line of mitigating evi-

---

[12]For example, Dr. Edwards' referral prompt was "[Crittenden] has an abnormal computerized EEG indicating abnormal brain function. Are there any indications of brain defect or damage on neuropsychological testing?"

dence Crittenden now presents does not compel the conclusion that the investigation was deficient. Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts. Given the range of experts trial counsel engaged here, to impose upon them the additional duty "to investigate independently of a request for information from an expert would 'defeat the whole aim of having experts participate in the investigation.' " *Sims*, 425 F.3d at 585-86 (quoting *Hendricks*, 70 F.3d at 1038).

**[18]** When a reasonable investigation does not turn up signs of additional, reasonably available mitigating evidence, competent counsel may make the judgment not to pursue a line of inquiry further. *See Bobby v. Van Hook*, 130 S.Ct. 13, 19 (2009) (per curiam). We hold that the California Supreme Court's rejection of this subclaim was not objectively unreasonable.[13]

---

[13]The multitude of cases cited by Crittenden's counsel are inapposite. *Cf. Frierson*, 463 F.3d at 990-92 (counsel did not review transcripts, investigative reports and psychiatric evaluations from defendant's previous trials); *Summerlin*, 427 F.3d at 631 (counsel relied exclusively on information developed at defendant's pre-trial competency examination); *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002) (counsel "failed to even minimally assist in the preparation of possible mental defenses related to psychiatric disorders or substance abuse"); *Caro*, 165 F.3d at 1226 (counsel did not consult with appropriate experts given defendant's known exposure to neurotoxins); *Hendricks*, 70 F.3d at 1043 (counsel did not investigate mental condition as mitigating factor, only as guilt phase defense); *Deutscher v. Whitley*, 884 F.2d 1152, 1159-61 (9th Cir. 1989) (holding that counsel was ineffective because he did not pursue mental health investigation even when records indicated that the defendant had previously been committed to mental hospitals), *vacated and remanded by Angelone v. Deutscher*, 500 U.S. 901 (1991), *and reaffirmed by Deutscher v. Angelone*, 16 F.3d 981, 984 (9th Cir. 1994); *Glenn v. Tate*, 71 F.3d 1204, 1207-10 (6th Cir. 1995) (counsel acquiesced to examination by court-appointed experts that were briefed exclusively by the prosecution); *Antwine v. Delo*, 54 F.3d 1357, 1365-68 (8th Cir. 1995) (only examination was court-ordered, 20-minute competency screening).

## 2.   *Investigation of Social Background*

Crittenden also contends that trial counsel did not adequately investigate his history of childhood abuse and behavioral difficulties. Dr. Woods related that Crittenden had told him that his mother "often used broomsticks, electrical cords, or branches from trees to beat him" and "kept very tight controls" on him. An investigator retained for state post-conviction proceedings reported that Crittenden's younger brother had told her that he and Crittenden "were physically beaten by their mother for the smallest infractions" and "constantly berated" while growing up.

Trial counsel's mitigation evidence presented during the penalty phase belies Crittenden's allegation of insufficient investigation and instead confirms the thoroughness of trial counsel's investigative efforts. Over 20 character witnesses — coaches, teachers, employers, ministers, friends, parents of friends and Crittenden's entire immediate family — ultimately spoke on his behalf. They uniformly said that Crittenden was polite, helpful, honest, hardworking, cooperative, courteous, kind, respectful and close with his family.[14]

[19] Trial counsel's "duty to investigate . . . 'does not necessarily require that every conceivable witness be interviewed.' " *Douglas*, 316 F.3d at 1088 (quoting *Hendricks*, 70 F.3d at 1040); *see also Van Hook*, 130 S. Ct. at 19

---

[14]For example, Crittenden's younger brother talked about his very close relationship with his brother growing up. Trial counsel had him describe how they used to play with animals at their grandparents' farm and go fishing with their father. Crittenden was a loving and supportive brother, whom he admired a great deal. Crittenden's then-wife described him as "very loving, very compassionate, sensitive, sincere, [and] honest." She said she "couldn't have asked to be married into a better family" than the Crittendens. She lived with them for a period of time and described them as "very close knit," "supportive of one another at all times" and "very generous." She and Crittenden would go to his family's home "on the weekend together to spend time" and to attend church with them.

("[D]efense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.' " (quoting *Strickland*, 466 U.S. at 699)). Unlike in *Stankewitz*, for instance, where we determined that counsel's investigation was inadequate, trial counsel here dispatched investigators to interview many people who "spent significant time with [Crittenden] during his childhood and youth." 365 F.3d at 719; *see also Wiggins*, 539 U.S. at 524 (holding that counsel were deficient for "abandon[ing] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"). That investigation did not produce any "tantalizing indications" that would " 'lead a reasonable attorney to investigate further.' " *Stankewitz*, 365 F.3d at 720 (quoting *Wiggins*, 539 U.S. at 527). Hoptowit said he "was not aware of any allegations that in fact Mr. Crittenden had been emotionally and physically abused by his mother."

**[20]** *Strickland* does not require counsel to continue "[q]uestioning a few more family members . . . when a lawyer truly has reason to doubt" that additional mitigating information will be found. *Rompilla*, 545 U.S. at 389. Here, trial counsel's investigators spoke with family members and friends who had information about Crittenden's childhood and relationship with his family, but none of them reported anything that would have placed counsel on notice to investigate further. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (" '[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence.' " (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir. 1997))); *accord Douglas*, 316 F.3d at 1088.

### 3.   *Mitigation Strategy*

Crittenden lastly criticizes trial counsel's presentation of mitigating evidence, contending they should have linked his

brain dysfunction to the killings, explained that it was amenable to treatment and contextualized it within his history of behavioral problems. Given that it is not objectively unreasonable to conclude that trial counsel undertook a reasonable investigation into mitigation evidence, *see supra* Op. at 18109-16, we hold that Crittenden has not rebutted the presumption that trial counsel's subsequent decisions were reasonable under prevailing professional norms.

[21] Crittenden first argues that trial counsel should have presented the import of his brain dysfunction more clearly and stressed that it could be treated. The record does not support this contention. During the penalty phase, Dr. Edwards and Dr. Seals offered medical testimony about Crittenden's brain abnormalities. (Dr. Bittle was present throughout the penalty phase, but did not testify.)[15] Dr. Edwards testified that Crittenden's brain "does not function like a normal brain" and that he had signs of organic "brain damage or brain dysfunction." Dr. Seals testified that Crittenden had abnormal electrical activity — "clear-cut evidence of physiologic abnormalities" — in the frontal lobe region of his brain. The frontal lobes serve an "executive decision type of function" and are the "executive control" area of the brain, Dr. Seals explained. Basically "inhibitory in character," they "make judgments as

---

[15]Trial counsel's decision not to call Dr. Bittle to testify in the penalty phase did not fall below an objective standard of reasonableness. Dr. Bittle had reviewed Crittenden's medical records and thus would have been subject to potentially devastating cross-examination. *See Harris*, 949 F.2d at 1525 (holding that it is "acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to [harmful] cross-examination"). As Hoptowit explained, trial counsel believed it was "essential" that Drs. Kaldor and Erickson's conclusion that Crittenden had antisocial personality disorder be kept from the jury. His decision to sideline Dr. Bittle was a tactical judgment supported by an adequate investigation, not evidence of constitutionally deficient performance. *Cf. Frierson*, 463 F.3d at 992 (finding deficient performance where counsel's failure to present psychiatric evaluations and chronic drug history was the result of an inadequate investigation and lack of preparation rather than a reasonable tactical decision).

to the appropriateness of certain actions, of recognizing how much, for instance, of emotional expression is appropriate." Dr. Seals testified that Crittenden's condition could be treated with medication, which would "quiet down" electrical activity and lead to "improvement in some of the dysfunctional areas." Hoptowit's closing argument reminded the jury of this medical testimony, emphasizing that the "frontal lobe area is — as Doctor Seals told you — the executive control area . . . [i]t's the regulator and inhibitor of all other brain functions" and that Crittenden's brain defect was "treatable[,] [c]ontrollable by medication."

**[22]** Crittenden complains that trial counsel did not say that such damage affected his "impulse" control, which Hoptowit now says was a "terrible oversight." We decline to assign any talismanic quality to the word "impulse." Although "lay people" might well be "unable to make a reasoned judgment" by themselves about the significance of a technical medical finding, Hoptowit had Dr. Seals explain the practical effect of frontal lobe damage on a person's ability to control himself. *Cf. Caro*, 165 F.3d at 1227 (emphasizing the importance of having experts explain technical psychological conditions to the jury). The jurors heard that the frontal lobe area inhibited behaviors, selectively released activities, regulated emotional responses, judged the appropriateness of actions and served as the "executive control" area of the brain, all of which provided the context needed to make the relevance of Crittenden's brain dysfunction clear.

**[23]** We also reject Crittenden's contention that trial counsel's mitigation strategy was so "ill-chosen that it was unreasonable on its face" because it emphasized Crittenden's positive characteristics "without offering some compelling . . . evidence about why he suddenly committed two murders."[16]

---

[16]Crittenden also argues that trial counsel's performance was deficient because the guilt-phase and penalty-phase strategies did not cohere, costing them valuable "credibility with the jury." As was the case in *Hen-*

This argument has no merit. With the benefit of an adequate investigation into potential mitigation evidence, trial counsel decided to stress Crittenden's positive qualities and, in Hoptowit's words, portray him as a "good student and an excellent athlete, a loving son, brother and husband who had never had any prior problems or disturbances." *Cf. Silva*, 279 F.3d at 830, 846 (explaining that counsel's decision to "forego all investigation" and present no explanatory mitigating evidence "was patently deficient" and could not be "immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy' ").

Hoptowit's opening statement in the penalty phase explained that Crittenden had an "average normal childhood, much like any of us would have had." By hearing from his family and friends, the jury would gain "some understanding of Steve Crittenden, the person." Hoptowit then capably elicited humanizing testimony that emphasized Crittenden's positive qualities. His closing argument returned to that theme, speaking of the love, respect and caring for Crittenden displayed by the many witnesses who testified on his behalf and downplaying his future dangerousness. Returning a sentence of life without parole instead of death would "allow the good to continue" in Crittenden — because up until the time of the murders, Hoptowit said, he had led a "legally blameless life" — while punishing, controlling and treating the "bad in Steve." To dwell on his extensive history of behavioral problems and his brain dysfunction, as Crittenden now suggests, would have undermined this strategy. Hoptowit believed that "presenting extensive evidence" about those issues would just

---

*dricks*, "[w]e have been cited no authority holding that . . . [a competent] attorney must treat the guilt and penalty phases of a death penalty trial as an organic whole and pursue the same or even complementary strategies in both phases." 70 F.3d at 1041.

have given the jury more "reason for imposing the death penalty."**[17]**

**[24]** Trial counsel faced a tough choice given what they knew at the time: they could elaborate upon Crittenden's brain dysfunction, discuss his history of behavioral problems and hope that the jury would find him less culpable, even if still legally responsible, for the murders. Or they could portray him as a young man with many redeeming personal qualities, who, perhaps because of a treatable brain defect, lost control of himself in a fateful departure from an otherwise law-abiding life. Although *Strickland* allows reviewing courts to engage in a rough comparison of the risks and benefits associated with a lawyer's decisions, *see, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 186 (1986); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam), we do not view Crittenden's newly proposed strategy as so obviously superior that any reasonably competent counsel would be compelled to select it over the one actually used. Given the circumstances as they appeared to trial counsel after conducting their investi-

---

**[17]**Trial counsel strenuously sought the exclusion of prior bad acts evidence. Citing *People v. Balderas*, 711 P.2d 480 (Cal. 1985), they convinced the prosecutor that the fact of Crittenden's convictions for attempted forcible escape and assault on a custodial officer could not be brought to the jury's attention during the penalty phase. The prosecutor then sought to introduce evidence of Crittenden's guilty plea to unlawful fighting in violation of California Penal Code section 415, and about two dozen alleged other acts of violence — for example, an April 1986 shoving incident with a high school classmate and a September 1986 altercation with an apartment neighbor. Trial counsel argued that to "introduce evidence of schoolyard fights" and similar "misconduct so common that likely most . . . of the persons in court at one time or another have been guilty of committing" would render unreliable and arbitrary the jury's penalty-phase determination. On trial counsel's motion, the trial court held a hearing pursuant to *People v. Phillips*, 711 P.2d 423 (Cal. 1985), to determine what, if any, of this evidence could be admitted. At the conclusion of this hearing, the trial court held that it would allow some witnesses to these alleged acts to testify during the penalty phase, but not others. In light of this ruling, the prosecutor decided to present no additional evidence in aggravation.

gation into mitigating circumstances, their choice of a humanizing strategy was not objectively unreasonable.[18]

**[25]** The stringent standards for habeas relief established by 28 U.S.C. § 2254(d) have not been satisfied. We hold that Crittenden has not stated a colorable ineffective assistance of counsel claim with respect to either the guilt or penalty phases of his trial, and therefore affirm the district court's dismissal of this claim.

### III.   Shackling

Crittenden contends that his shackling was not objectively reasonable because there was no compelling justification and the trial court failed to pursue less restrictive alternatives before imposing the physical restraints. We apply AEDPA's deferential standard of review with respect to the state court's reasoned denial of this claim when it rejected Crittenden's first state habeas petition. In Crittenden's subsequent federal habeas proceedings, the district court determined that the shackling was not unconstitutional in light of *Deck v. Missouri*, 544 U.S. 622 (2005), which clarified that the requirement of considering less restrictive alternatives to shackling was not clearly established Supreme Court law at the time. We agree.

Before trial, the court held a hearing to determine whether to implement security measures during the trial. An assistant marshal for the Placer County Sheriff's Office and a criminal investigator for the Butte County District Attorney's Office testified. After escaping from jail in May 1987, Crittenden entered a house and took the resident at gunpoint, with what

---

[18]We caution that a penalty-phase defense "based solely upon humanizing, rather than explanatory, mitigation evidence," *Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005), has considerable pitfalls, and may reasonably be undertaken only after constitutionally adequate investigation and preparation on counsel's part.

was later identified as a toy gun, and forced him to drive to Sacramento, where police apprehended Crittenden. Several months later, Crittenden attempted another escape with two other inmates. Crittenden grabbed a guard and slammed him against cell bars. Additional correctional staff intervened and foiled the attempted escape.

Both the assistant marshal and criminal investigator also testified that Crittenden had not had any behavioral problems in his previous court appearances during which security arrangements were limited to physical restraints while he was escorted into the courtroom, which were released when he sat down at counsel table. The criminal investigator testified that he believed Crittenden was an escape risk.

The assistant marshal proposed security arrangements for the trial, which included escorting Crittenden into and out of the courtroom in leg irons and handcuffs, outside of the jury's presence, and placing him in a security chair and using a chain to secure him to the chair when seated at the counsel table. The chain would be hidden by loose clothing and the leg irons and handcuffs would be removed before the jury entered the courtroom. He stated that Crittenden would need to be chained or handcuffed to the security chair to prevent him from being free to move about, but that he intended "not to have Mr. Crittenden appear in any sort of restraints in the presence of the jury," and that the jury not see the chain.

The trial court found a "likelihood of escape in the courtroom or . . . nonconforming conduct relating to that in the courtroom" based on Crittenden's escape from jail, his subsequent attempted escape involving violence, the serious charges with which Crittenden was being charged and Crittenden's athleticism and physical capacity to escape from the courtroom. The trial court also noted that it took into consideration that the proposed restraints were unobtrusive, would be hidden from the jury view and that all efforts would be made by the court to not call attention to the fact that Critten-

den could not stand or move around in the chair. The trial court stated, "in exercising this discretion I am sanctioning the use of shackles and handcuffs only outside the presence of the jury and opt[ ] at this point in time for less visible restraints to insure that safety to the court personnel, to the participants and to counsel as well, and to Mr. Crittenden, himself." The trial court further stated that it would not sua sponte give an instruction about the security chair or chain, because it was presuming that the jury would not see it, but stated that it would give an instruction if counsel requested.

**[26]** First, Crittenden argues that his shackling was not objectively reasonable because the justification was not compelling. He fails to rebut by clear and convincing evidence the trial court's finding on the record that the restraints were justified by a state interest specific to Crittenden's trial, namely his likelihood of escape or "nonconforming conduct." *See* § 2254(d)(2), (e)(1). Although his escape history stemmed from a time "long before commencement of trial" and he was cooperative in his previous court appearances, these arguments and their factual basis were before the trial court at the time it decided to impose restraints. Crittenden has not presented any new evidence to warrant a different conclusion.

Next, Crittenden argues that the trial court, contrary to clearly established federal law, did not pursue less restrictive alternatives before shackling him to the chair and did not weigh the benefits and burdens of shackling against other options. The procedures that Crittenden refers to are rooted in a line of our cases such as *Castillo v. Stainer*, 983 F.2d 145, 147-48 (9th Cir. 1992), and *Gonzalez v. Pliler*, 341 F.3d 897, 902 (9th Cir. 2003). We agree with the district court that established Supreme Court law at the time of Crittenden's trial did not require such procedures.[19]

---

[19]The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of this Court's decisions at the time of the relevant state-court decision," *Wil-*

In *Deck*, the Supreme Court concluded that "[t]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. at 629. The Court made clear: "The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Id.* at 633. One of the security concerns the Court specifically identified is "escape risk[ ] related to the defendant at trial." *Id.*

**[27]** Of importance here, *Deck* suggests that there was not clearly established law requiring a trial court to take specific procedural steps before imposing physical restraints. The Supreme Court stated that "[c]ourts and commentators share close to a consensus" disapproving routine shackling. *Id.* at 628. The Court juxtaposed this with its statement:

> Lower courts have disagreed about the specific procedural steps a trial court must take prior to shackling, about the amount and type of evidence needed to justify restraints, and about what forms of prejudice might warrant a new trial, but they have not questioned the basic principle.

*Id.* at 629. The Court cited federal and state cases, including case law from this circuit, that discuss and apply various different procedural and evidentiary requirements to justify restraints. *Id.* at 628-29. This suggests that our case law requiring a court to weigh the benefits and burdens of shackling and pursue less restrictive alternatives was not clearly

---

*liams v. Taylor*, 529 U.S. 362, 412 (2000), or in other words, "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision," *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

established federal law. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) (divergence of courts reflects lack of guidance from the Supreme Court as to clearly established federal law). *Deck* also does not itself mandate specific procedures or evidence that must be considered before imposing restraints. *Deck* leaves this to the discretion of the trial court, stating that it "may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." 544 U.S. at 629.

Therefore, even if the trial court did not weigh the benefits and burdens of shackling or consider less restrictive alternatives, as Crittenden argues it failed to do, clearly established federal law did not require it to do so. The trial court held a hearing and then exercised its discretion to take account of special circumstances, specifically "the likelihood of escape . . . or the fact of nonconforming conduct relating to that in the courtroom," that it determined called for shackling in the manner ordered. The trial court made a clear record of its findings and explained that its determination was based on Crittenden's prior escape, escape attempt, the nature of the charges and his athleticism.[20] This determination was supported by the testimony of the assistant marshal and criminal investigator, who were cross-examined by defense counsel.

**[28]** We hold that the trial court's decision to permit physical restraint of Crittenden at trial was not based on an unreasonable determination of fact, and Crittenden has failed to rebut this presumption by clear and convincing evidence and has not established a violation of clearly established law. We need not reach the issue of whether Crittenden was prejudiced by the shackling.

---

[20]In contrast, in *Deck,* the trial court judge did not make formal or informal findings on the record, and did not refer to any escape risk or threat to courtroom security. 544 U.S. at 634. The trial court judge gave as explanation for Deck's shackling in the penalty phase only that he "has been convicted." *Id.* The Court concluded that the trial judge had not properly explained why shackles were necessary. *Id.* at 634-35.

## IV. Juror Misconduct

Crittenden appeals the district court's denial of relief on his claim of juror misconduct based on juror Clark's consultation of the Bible and the jury's brief discussion of a biblical passage during penalty phase deliberations. The California Supreme Court denied this claim on the merits. We affirm.

**[29]** Penalty phase deliberations began on the afternoon of Wednesday, May 10, 1989, and continued all day Thursday and Friday. Over the weekend, Clark later acknowledged, she "studied the Bible . . . and found a scripture passage right on point." That passage was Genesis 9:6, which Clark rendered as "[w]ho so sheddeth man's blood by man shall his blood be shed." During the deliberations that resumed Monday morning, Clark mentioned the passage. At the federal evidentiary hearing on this claim, juror Hodge testified that one of the "elderly ladies" (presumably Clark) had mentioned "something from the Bible." Hodge did not believe there was "discussion about the passage . . . in relation to the case," and any other discussion was "very limited" in time. Deliberations continued without any "further discussion of the Bible." The other two jurors asked about the passage had no recollection of any Bible-related discussion. On Monday afternoon, the jury returned a verdict of death. Deliberations lasted a total of approximately 19 hours over four days.

We need not decide here whether clearly established Supreme Court law required the treatment of the Bible as extrinsic evidence, *compare McNair v. Campbell*, 416 F.3d 1291, 1308 (11th Cir. 2005) (holding that biblical passages constituted extrinsic evidence), *with Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (holding that biblical passages did not bear on facts at issue in the case and so were not "extraneous prejudicial information"), or whether reading and sharing biblical passages constitutes juror misconduct, *see Fields v. Brown*, 503 F.3d 755, 778, 781 (9th Cir. 2007) (en banc) (declining to decide whether juror misconduct occurred

when a juror shared his notes, including a biblical reference, with other jurors because the noted had "no substantial and injurious effect or influence in determining the jury's verdict"). Even if Clark's consulting of the Bible and sharing of the Genesis 9:6 passage with other jurors violated Crittenden's Sixth Amendment right to a jury "verdict . . . based upon the evidence developed at the trial," *Turner v. Louisiana*, 379 U.S. 466, 472 (1965), he has not established prejudice. The alleged introduction of extrinsic evidence into deliberations did not have a " 'substantial and injurious effect or influence in determining the jury's verdict' " of death. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).[21]

**[30]** Clark's private study of the Bible was not prejudicial. Although we agree that he was "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors," *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam), the bare showing that a juror read a religious text outside the jury room does not establish prejudice. Such a rule has no support in precedent and is, at the very least, in tension with the Supreme Court's teaching that "a sentencing jury must be able to give a reasoned moral response to a defendant's mitigating evidence." *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (internal quotation marks omitted).

Our opinion in *Fields*, in which we also considered a claim of Bible-related juror misconduct, forecloses Crittenden's claim that Clark's mention of Genesis 9:6 prejudiced him. In *Fields*, the jury's discussion of biblical passages was far more extensive, but we nonetheless concluded, reviewing the matter de novo, that there was no prejudice. The foreperson there

---

[21]"[T]he question of prejudice from extrinsic information is an objective one, not a subjective one." *Fields*, 503 F.3d at 781 n.22. "Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence . . . may not." *Id.* at 778; *see also* Fed. R. Evid. 606(b) (same).

"checked the Bible and . . . made notes 'for' and 'against' imposition of the death penalty which he brought to the deliberations the next day." *Fields*, 503 F.3d at 777. His notes were passed around and the religious material "discussed by some jurors." *Id.* at 777-78. By contrast, nothing "but the briefest mention of the Bible verse took place" during penalty phase deliberations in Crittenden's trial. As the district court found after ordering an evidentiary hearing, the only juror who recalled any mention of the biblical passage recalled that there was no discussion of it "except for a possible statement regarding the verse's irrelevance to the case." Moreover, the passage itself was innocuous compared to the contents of the foreperson's note in *Fields*, which quoted four passages besides Genesis 9:6, including the "eye for eye" maxim and Romans 13:1-5, *Fields*, 503 F.3d at 777 n.15, which has been understood as cloaking the "State with God's authority," *id.* at 798-99 (Berzon, J., dissenting) (quoting *Sandoval v. Calderon*, 241 F.3d 765, 779 (9th Cir. 2000)) (internal quotation marks omitted).

Crittenden attempts to distinguish *Fields*, but the differences identified — for example, the timing of the Bible-related discussion and the less aggravated nature of his own offenses — do not alter our conclusion that *Fields* controls here. *See Fields*, 503 F.3d at 781-82. Clark's conduct had even less of an "effect or influence in determining the jury's verdict" than that of the foreperson's in *Fields*. *Id*. at 781. Fields was unable to establish prejudice on more troubling facts and a less deferential standard of review. Nor can Crittenden here. His claim fails.

## CONCLUSION

We vacate the district court's denial of Crittenden's habeas petition on the *Batson* claim and remand for a determination under *Batson*'s third step whether Crittenden has proved by a preponderance of the evidence that the prosecutor's decision to strike Ms. Casey was "motivated in substantial part by

race." *Cook*, 593 F.3d at 815. In all other respects we affirm the district court's denial of Crittenden's habeas petition.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**