FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SMITHKLINE BEECHAM
CORPORATION, DBA
GlaxoSmithKline,
          *Plaintiff-Appellee*,

v.

ABBOTT LABORATORIES,
          *Defendant-Appellant*.

No. 11-17357

D.C. No.
4:07-cv-05702-CW

SMITHKLINE BEECHAM
CORPORATION, DBA
GlaxoSmithKline,
          *Plaintiff-Appellant*,

v.

ABBOTT LABORATORIES,
          *Defendant-Appellee*.

No. 11-17373

D.C. No.
4:07-cv-05702-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, Chief District Judge, Presiding

Argued and Submitted
September 18, 2013—San Francisco, California

Filed January 21, 2014

Before: Mary M. Schroeder, Stephen Reinhardt,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### Jury Selection

Reversing the district court's judgment in an antitrust case concerning a licensing agreement and the pricing of HIV medications, the panel held that classifications based on sexual orientation are subject to heightened scrutiny, and in jury selection, equal protection prohibits peremptory strikes based on sexual orientation.

The panel held that even though the Ninth Circuit had in the past applied rational basis review, *United States v. Windsor*, 133 S. Ct. 2675 (2013) (holding Defense of Marriage Act unconstitutional), required that heightened scrutiny be applied to equal protection claims involving sexual orientation. The panel held that in light of the history of exclusion of gays and lesbians from democratic institutions and the pervasiveness of stereotypes about the group, the protection of *Batson v. Kentucky*, 476 U.S. 79 (1986), applies, and equal protection forbids striking a juror on the basis of

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

his sexual orientation. The panel remanded the case for a new trial.

## COUNSEL

Daniel B. Levin (argued), Jeffrey I. Weinberger, Stuart N. Senator, Keith R.D. Hamilton, Kathryn A. Eidmann, Munger, Tolles, & Olson LLP, Los Angeles, California; Krista Enns, Winston & Strawn LLP, San Francisco, California; James F. Hurst, Samuel S. Park, Winston & Strawn LLP, Chicago, Illinois; Charles B. Klein, Steffen N. Johnson, Matthew A. Campbell, Jacob R. Loshin, Winston & Strawn LLP, Washington, D.C., for Defendant-Appellant/Cross-Appellee.

Lisa S. Blatt (argued), Sarah M. Harris, Arnold & Porter LLP, Washington, D.C.; Brian J. Hennigan (argued), Alexander F. Wiles, Carlos R. Moreno, Trevor V. Stockinger, Lillie A. Werner, Christopher Beatty, Andrew Ow, Irell & Manella LLP, Los Angeles, California; for Plaintiff-Appellee/Cross-Appellant.

Shelbi D. Day, Tara L. Borelli, Jon W. Davidson, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for Amicus Curiae.

## OPINION

REINHARDT, Circuit Judge:

The central question in this appeal arises out of a lawsuit brought by SmithKline Beecham (GSK) against Abbott Laboratories (Abbott) that contains antitrust, contract, and

unfair trade practice (UTPA) claims. The dispute relates to a licensing agreement and the pricing of HIV medications, the latter being a subject of considerable controversy in the gay community. GSK's claims center on the contention that Abbott violated the implied covenant of good faith and fair dealing, the antitrust laws, and North Carolina's Unfair Trade Practices Act by first licensing to GSK the authority to market an Abbott HIV drug in conjunction with one of its own and then increasing the price of the Abbott drug fourfold, so as to drive business to Abbott's own, combination drug.

During jury selection, Abbott used its first peremptory strike against the only self-identified gay member of the venire. GSK challenged the strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing that it was impermissibly made on the basis of sexual orientation. The district judge denied the challenge.

This appeal's central question is whether equal protection prohibits discrimination based on sexual orientation in jury selection. We must first decide whether classifications based on sexual orientation are subject to a standard higher than rational basis review. We hold that such classifications are subject to heightened scrutiny. We also hold that equal protection prohibits peremptory strikes based on sexual orientation and remand for a new trial.

## I.

During jury selection, the district judge began by asking questions of the potential jurors based on their questionnaires, and then each party's counsel had an opportunity to ask additional questions. When the judge turned her attention to

Juror B, a male, she inquired first about his employment, as she had done with each of the previous members of the venire. Juror B stated that he worked as a computer technician for the Ninth Circuit Court of Appeals in San Francisco. During the course of the judge's colloquy with Juror B, the juror revealed that his "partner" studied economics and investments. When the district judge followed up with additional questions, the prospective juror referred to his partner three times by using the masculine pronoun, "he," and the judge subsequently referred to Juror B's partner as "he" in a follow-up question regarding his employment status. Responding to additional questions from the judge, Juror B stated that he took an Abbott or a GSK medication and that he had friends with HIV. When the time arrived for Abbott's counsel, Weinberger, to question Juror B, the questioning was brief and limited. Counsel's first question concerned Juror B's knowledge of the medications that were the focal point of the litigation: "You indicated that you know some people who have been diagnosed with HIV. . . . Do you know anything about the medications that any of them are on?" Juror B responded, "Not really." Abbott's counsel then continued: "Do you know whether any of them are taking any of the medications that we are going to be talking about here[,] . . . Norvir or Kaletra or Lexiva, any of those?" Juror B responded that he did not know whether his friends took those medications, but that he had heard of Kaletra. He added that he didn't know much about the drug and that he had no personal experiences with it. In sum, Abbott's counsel asked Juror B five questions, all regarding his knowledge of the drugs at issue in the litigation. Abbott's counsel did not ask Juror B when he had taken either an Abbott or GSK medication, how long ago, which medication it was, or the purpose of the medication. He also

failed to ask any questions as to whether Juror B could decide the case fairly and impartially.

When the time came for peremptory challenges, Abbott exercised its first strike against Juror B.  GSK's counsel, Saveri, immediately raised a *Batson* challenge, and the following discussion ensued:

> **Mr. Saveri:** Okay.  So, you know, the first challenge, your honor, is a peremptory challenge of someone who is — who I think is or appears to be, could be homosexual.  That's use of the peremptory challenge in a discriminatory way.
>
> The problem here, of course, your honor, is the litigation involves AIDS medication.  The incidents [sic] of AIDS in the homosexual community is well-known, particularly gay men.
>
> So with that challenge, Abbott wants to exclude from — it looks like Abbott wants to exclude from the pool anybody who is gay.  So I am concerned about that.  I wanted to raise it.
>
> **The Court:** Well, I don't know that, number one, whether *Batson* applies in civil, and number two, whether *Batson* ever applies to sexual orientation.  Number three, how we would know — I mean, the evil of *Batson* is not that one person of a given group is excluded, but that everyone is.  And there is

no way for us to know who is gay and who isn't here, unless somebody happens to say something.

There would be no real way to analyze it. And number four, one turns to the other side and asks for the basis for their challenge other than the category that they are in, and if you have one, it might be the better part of valor to tell us what it is.

**Mr. Weinberger:** Well, he —

**The Court:** Or if you don't want to, you can stand on my first three reasons.

**Mr. Weinberger:** I will stand on the first three, at this point, your honor. I don't think any of the challenge applies. I have no idea whether he is gay or not.

**Mr. Saveri:** Your honor, in fact, he said on voir dire that he had a male partner. So —

**Mr. Weinberger:** This is my first challenge. It's not like we are sitting here after three challenges and you can make a case that we are excluding anybody.

The district judge then stated that she would allow Abbott's strike and would reconsider her ruling if Abbott struck other gay men.

At the conclusion of the four-week trial, the jury returned with a mixed verdict. It held for Abbott on the antitrust and UTPA claims, and for GSK on the contract claim. It awarded $3,486,240 in damages to GSK.

Abbott appealed the jury verdict on the contract claim, and GSK cross-appealed. On cross-appeal, GSK contends that a new trial is warranted on all counts, including the contract claim, because Abbott unconstitutionally used a peremptory strike to exclude a juror on the basis of his sexual orientation. We hold that the exclusion of the juror because of his sexual orientation violated *Batson* and we remand for a new trial.

## II.

The *Batson* analysis involves a three-part inquiry. First, the party challenging the peremptory strike must establish a prima facie case of intentional discrimination. *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006). Second, the striking party must give a nondiscriminatory reason for the strike. *See id.* Finally, the court determines, on the basis of the record, whether the party raising the challenge has shown purposeful discrimination. *Id.* Because the district judge applied the wrong legal standard in evaluating the *Batson* claim, we review the *Batson* challenge de novo. *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009).

To establish a prima facie case under *Batson*, GSK must produce evidence that 1) the prospective juror is a member of a cognizable group; 2) counsel used a peremptory strike against the individual; and 3) "the totality of the circumstances raises an inference that the strike was motivated" by the characteristic in question. *Collins*,

551 F.3d at 919.  "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson v. California*, 545 U.S. 162, 170 (2005).  The burden on the challenging party at the prima facie stage is "not an onerous one."  *Boyd v. Newland*, 467 F.3d 1139, 1151 (9th Cir. 2004).   It is a burden of production, not a burden of persuasion.  *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010).

GSK has established a prima facie case of intentional discrimination.  Juror B was the only juror to have identified himself as gay on the record, and the subject matter of the litigation presented an issue of consequence to the gay community.  When jury pools contain little racial or ethnic diversity, we have held that a strike of the lone member of the minority group is a "relevant consideration" in determining whether a prima facie case has been established.  *Id.* at 955.  We have further cautioned against failing to "look closely" at instances in which the sole minority is struck from the venire; this is because failure to do so would innoculate peremptory strikes against *Batson* challenges in jury pools with scant diversity.  *Collins*, 551 F.3d at 921; *see also United States v. Chinchilla*, 874 F.2d 695, 698 n.5 (9th Cir. 1989) ("[A]lthough the striking of one or two members of the same racial group may not always constitute a prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury.").

There is also reason to infer that Abbott struck Juror B on the basis of his sexual orientation because of its fear that he would be influenced by concern in the gay community over Abbott's decision to increase the price of its HIV drug.  When we analyzed whether the appellant had made out a prima

facie case in *Johnson v. Campbell*, 92 F.3d 951 (9th Cir. 1996), for instance, we found it significant that the struck juror's sexual orientation had no relevance to the subject matter of the litigation. *Id.* at 953 & n.1. The converse is true as well. In *J.E.B. v. Alabama*, 511 U.S. 141 (1994), the Supreme Court stated that when the gender of the juror coincided with the subject matter of the case, the potential for an impermissible strike based on sex increases substantially. *Id.* at 140. Here, the increase in the price of the HIV drug had led to considerable discussion in the gay community. Upon raising the *Batson* challenge, GSK's counsel argued that the subject matter of the litigation raised suspicions regarding the purpose of the strike: "The problem here . . . is the litigation involves AIDS medications. The incidents [sic] of AIDS in the homosexual community is well-known, particularly gay men." The potential for relying on impermissible stereotypes in the process of selecting jurors was "particularly acute" in this case. *Id.*; *see also Powers v. Ohio*, 499 U.S. 400, 416 (1991).[1] Viewing the totality of the circumstances, we have no difficulty in concluding that GSK has raised an inference of discrimination and established a prima facie case.

---

[1] In evaluating an ineffective assistance of counsel claim for failure to raise a *Wheeler* claim, the California analog of a *Batson* claim, we stated that asking Hispanic-surnamed venire members whether they would be biased in evaluating a case involving a Hispanic defendant did not pose any constitutional problem because "asking questions about potential bias is the purpose of voir dire." *Carrera v. Ayers*, 699 F.3d 1104, 1111 (9th Cir. 2012) (en banc). *Carrera* suggests that if Abbott's counsel was concerned that gay members of the jury pool might be biased because the price increase had gained some notoriety in the gay community, he could have questioned Juror B about this potential bias. Instead of pursuing this line of questioning about Juror B's ability to assess the case fairly, Abbott's counsel struck him without any indication that he was biased, thereby raising the inference that he had relied on an impermissible assumption about Juror B's ability to be impartial.

Also, Abbott declined to provide any justification for its strike when offered the opportunity to do so by the district court. After the judge stated that she might reject the *Batson* challenge on legal grounds that were in fact erroneous,[2] she told Abbott's counsel that he could adopt those grounds, although she advised him that "it might be the better part of valor" to reveal the basis for his strike. Abbott's counsel replied that he would rely on the grounds given by the judge and further explained, "I don't think any of the challenge applies. I have no idea whether he is gay or not." He later added that he could not have engaged in intentional discrimination because this was only his first strike.

Counsel's statement that he did not know that Juror B was gay is neither consistent with the record nor an explanation for his strike. First, Juror B and the judge referred to Juror B's male partner several times during the course of voir dire and repeatedly used masculine pronouns when referring to him. Given the information regarding Juror B's sexual orientation that was adduced during the course of voir dire, counsel's statement was far from credible. *See Snyder*, 552 U.S. at 482–83 (comparing counsel's proffered reasons

---

[2] The district judge offered her view that *Batson* did not apply in civil cases or when only a single member of a protected group is struck. The first statement — that *Batson* does not apply to civil cases — is clearly incorrect. The Supreme Court held over twenty years ago that *Batson* applies in the civil context. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991). Her statement that *Batson* does not apply when only a single member of the given group is excluded is also a legal error because "[t]he [C]onstitution forbids striking even a single prospective juror for a discriminatory purpose." *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *see also Snyder v. Louisiana*, 552 U.S. 472, 474 (2008) (citing and quoting *Vasquez-Lopez*). Her final statement expressing uncertainty about whether *Batson* applies to sexual orientation is the subject of this appeal.

with the plausible facts on the record).  Second, the false statement was non-responsive; it was simply a denial of a discriminatory intent and it in no way provided a reason, colorable or otherwise, for striking Juror B.  Counsel's denial of a discriminatory motive had the opposite effect of that intended.  Because the denial was demonstrably untrue, it undermines counsel's argument that his challenge was not based on intentional discrimination.  Taking all these factors together, including the absence of any proffered reason for the challenge, a strong inference arises that counsel engaged in intentional discrimination when he exercised the strike.[3] *Paulino v. Harrison* (*Paulino II*), 542 F.3d 692, 702–03 (9th Cir. 2008); *see also Johnson*, 545 U.S. at 171 n.6 ("In the unlikely hypothetical in which [counsel] declines to respond to a trial judge's inquiry regarding his justification for making a strike, the evidence before the judge would consist not only of the original facts from which the prima facie case was established, but also [counsel's] refusal to justify his strike in light of the court's request.").

Abbott's counsel asked Juror B only five questions and failed to question him meaningfully about his impartiality or potential biases.  *See Collins*, 551 F.3d at 921.  Combined with Abbott's counsel's statement, in the face of clear evidence in the record to the contrary, that he did not know that Juror B was gay, the voir dire reveals that Abbott's strike was based not on a concern for Juror B's actual bias, but on a discriminatory assumption that Juror B could not impartially evaluate the case because of his sexual orientation.  *See Kesser*, 465 F.3d at 360–62.

---

[3] Abbott's adoption of the court's erroneous legal reasons why *Batson* might be inapplicable to the type of trial before her does not, of course, provide or even suggest any explanation as to why counsel struck Juror B.

Finally, Abbott attempts to offer several neutral reasons for the strike in its brief on appeal to our Court, but these reasons are also belied by the record. *See id.* at 360 ("[I]f a review of the record undermines . . . many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."). Ordinarily, it does not matter what reasons the striking party *might* have offered because "[w]hat matters is the *real* reason [the juror was] stricken," *Paulino v. Castro* (*Paulino I*), 371 F.3d 1083, 1090 (9th Cir. 2004) (emphasis in original): that is, the reason offered at the time of the strike, if true. Here, Abbott offered no reasons for the strike at the voir dire, but we know from the reasons offered on appeal after full deliberation by highly respected and able counsel that even the best explanations that counsel could have offered are pretextual.[4] *See Kesser*, 465 F.3d at 360.

---

[4] One reason advanced by Abbott on appeal is that Juror B was the only juror who had lost friends to AIDS. We reject this reason because it is not supported by the record. Nowhere does the record show that Juror B had friends who died of complications due to HIV or AIDS.

A second reason advanced by Abbott on appeal is that Juror B was acquainted with many people in the legal field. Other jurors, however, who were lawyers, and other jurors with close relatives who were lawyers were not stricken but served on the jury.

Third, Abbott speculates on appeal that because Juror B was a computer technician at the Court, other jurors "might have given extra weight" to his opinions. We have more respect for jurors than to credit the idea that Juror B would have more influence on his fellow jurors than would the other jurors, including the two lawyers who remained on the panel. This is the kind of "highly speculative" rationale that the Supreme Court rejected in *Snyder*, 552 U.S. at 482.

Finally, Abbott points out that Juror B was the only potential juror who testified that he had heard of any of the three drugs at issue. When

The record reflects that had the district judge applied the law correctly, she would necessarily have concluded that Abbott's strike of Juror B was impermissibly made on the basis of his sexual orientation. *See United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003). Because GSK has established a prima facie case, Abbott offered no nondiscriminatory reason for its strike of Juror B at trial, and Abbott does not now offer in its brief on appeal any colorable neutral explanation for the strike, only one result is possible here. The prima facie evidence that the strike was based on a discriminatory motive is unrefuted, and on appeal it is clear that Abbott has no further credible reasons to advance nor evidence to offer. Accordingly, we need not remand the question whether a *Batson* violation occurred. *See id.* at 969–70. The record persuasively demonstrates that Juror B was struck because of his sexual orientation. This Court may therefore perform the third step of the *Batson* analysis and conclude "even based on a 'cold record,' that [Abbott's] stated reasons for striking [Juror B] was a pretext for purposeful discrimination." *Id.* at 969 n.5.

---

asked what he knew about the drug, however, Juror B replied, "not much," and stated that he had no personal experience with it.

Here, three of the four reasons offered by Abbott are pretextual and the record casts strong doubt on the fourth. In such a circumstance, we follow the rule of our en banc decision in *Kesser*, and conclude that none of those reasons can withstand judicial scrutiny. *See id.* at 360 ("A court need not find all nonracial reasons pretextual in order to find racial discrimination."); *see also id.* ("'Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.'" (quoting *Chinchilla*, 874 F.2d at 699)).

## III.

We must now decide the fundamental legal question before us: whether *Batson* prohibits strikes based on sexual orientation.[5]  In *Batson*, the Supreme Court held that the privilege of peremptory strikes in selecting a jury is subject to the guarantees of the Equal Protection Clause.  476 U.S. at 89.  *Batson*, of course, considered peremptory strikes based on race.  At stake, the Court explained, were not only the rights of the criminal defendant, but also of the individual who is excluded from participating in jury service on the basis of his race.  *Id.* at 87.  Allowing peremptory strikes based on race would "touch the entire community" because it would "undermine public confidence in the fairness of our system of justice."  *Id.*  Thus, the Court held, the exclusion of prospective jurors because of their race would require reversal upon a finding of intentional discrimination.  *Id.* at 100.  Eight years later, in *J.E.B.*, the Court extended *Batson* to peremptory strikes made on the basis of gender.  While expanding *Batson*'s ambit, *J.E.B.* explained the scope of its

---

[5] Citing *Johnson v. Campbell*, Abbott urges us to avoid deciding whether *Batson* applies to sexual orientation by holding that a prima facie showing cannot be demonstrated because "'an obvious neutral reason for the challenge' appears in the record."  As we have explained, there are no "obvious neutral" reasons for Abbott's strike in the record or even in Abbott's brief on appeal.  In *Campbell*, we rejected a *Batson* challenge based on sexual-orientation where (1) counsel "made no attempt to show discriminatory motivation on the part of the opposing attorney," (2) there was no showing that opposing counsel was aware of the juror's sexual orientation, (3) there was an obvious neutral reason for the strike, and (4) the juror's sexual orientation had no bearing on the subject matter of the case.  *Campbell*, 92 F.3d at 953.  All of the factors that were absent in *Campbell* are present here.  Because the record shows that there was purposeful discrimination here, the path we took in *Campbell* is not available to us.

expansion.  The Court stated that "[p]arties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review."   511 U.S. at 143; *accord United States v. Santiago-Martinez*, 58 F.3d 422, 423 (9th Cir. 1995).  Thus, if sexual orientation is subject to rational basis review, Abbott's strike does not require reversal.

We have in the past applied rational basis review to classifications based on sexual orientation.  In *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990), and *Philips v. Perry*, 106 F.3d 1420, 1425 (9th Cir. 1997), we applied rational basis review when upholding Department of Defense and military policies that classified individuals on the basis of sexual orientation.  More recently, in *Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir. 2008), an Air Force reservist brought due process and equal protection challenges to her suspension from duty on account of her sexual relationship with a woman.  *Id.* at 809.  We considered the meaning of the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 653 (2003), and concluded that because *Lawrence* relied only on substantive due process and not on equal protection, it affected our prior *substantive due process* cases, but not our *equal protection* rules.  *Witt*, 527 F.3d at 821.  As a result, although we applied heightened scrutiny to the substantive due process challenge in *Witt*, we did not change our level of scrutiny for the equal protection challenge.  *Id.*  We stated that *Lawrence* "declined to address equal protection," and relying on *Philips*, our pre-*Lawrence* decision, we continued to apply rational basis review to equal protection challenges.  *Id.* at 821.  Thus, we are bound here to apply rational basis review to the equal protection claim in the absence of a post-*Witt* change in the law by the Supreme

Court or an en banc court.  *See Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc).  Here, we turn to the Supreme Court's most recent case on the relationship between equal protection and classifications based on sexual orientation: *United States v. Windsor*, 133 S. Ct. 2675 (2013). That landmark case was decided just last term and is dispositive of the question of the appropriate level of scrutiny in this case.

*Windsor*, of course, did not expressly announce the level of scrutiny it applied to the equal protection claim at issue in that case, but an express declaration is not necessary. *Lawrence* presented us with a nearly identical quandary when we confronted the due process claim in *Witt*.  Just as *Lawrence* omitted any explicit declaration of its level of scrutiny with respect to due process claims regarding sexual orientation, so does *Windsor* fail to declare what level of scrutiny it applies with respect to such equal protection claims.  Nevertheless, we have been told how to resolve the question.  *Witt*, 527 F.3d at 816.  When the Supreme Court has refrained from identifying its method of analysis, we have analyzed the Supreme Court precedent "by considering what the Court actually did, rather than by dissecting isolated pieces of text."  *Id*.

In *Witt*, we looked to three factors in determining that *Lawrence* applied a heightened level of scrutiny rather than a rational basis analysis.  We stated that *Lawrence* did not consider the possible post-hoc rationalizations for the law, required under rational basis review.  *Witt*, 527 F.3d at 817. We further explained that *Lawrence* required a "legitimate state interest" to "justify" the harm that the Texas law inflicted as is traditionally the case in heightened scrutiny. *Witt*, 527 F.3d at 817 (quoting *Lawrence*, 539 U.S. at 578)

(internal quotation marks omitted).  Finally, we looked to the cases on which *Lawrence* relied and found that those cases applied heightened scrutiny.  *Witt*, 527 F.3d at 817.  Applying the *Witt* test here, we conclude that *Windsor* compels the same result with respect to equal protection that *Lawrence* compelled with respect to substantive due process:  *Windsor* review is not rational basis review.  In its words and its deed, *Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review.  In other words, *Windsor* requires that heightened scrutiny be applied to equal protection claims involving sexual orientation.

Examining *Witt*'s first factor, *Windsor*, like *Lawrence*, did not consider the possible rational bases for the law in question as is required for rational basis review.  The Supreme Court has long held that a law must be upheld under rational basis review "if any state of facts reasonably may be conceived to justify" the classifications imposed by the law.  *McGowan v. Maryland*, 366 U.S. 420, 426 (1961).  This lowest level of review does not look to the actual purposes of the law.  Instead, it considers whether there is some conceivable rational purpose that Congress could have had in mind when it enacted the law.

This rule has been repeated throughout the history of modern constitutional law.  In *Williamson v. Lee Optical*, 348 U.S. 483 (1955), the Court repeatedly looked to what the legislature "might have concluded" in enacting the law in question and evaluated these hypothetical reasons.  *Id.* at 487.  In *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166 (1980), the Court emphasized that deference to post-hoc explanations was central to rational basis review:

> Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,". . . because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing. The "task of classifying persons for . . . benefits . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," . . . and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

*Id.* at 179 (internal citations omitted). More recently, the Supreme Court has again stated that under rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Fed. Commc'n Comm'n v. Beach Commc'n, Inc.*, 508 U.S. 307, 315 (1993).

In *Windsor*, instead of conceiving of hypothetical justifications for the law, the Court evaluated the "essence" of the law. *Windsor*, 133 S. Ct. at 2693. *Windsor* looked to DOMA's "design, purpose, and effect." *Id.* at 2689. This inquiry included a review of the legislative history of DOMA. *Windsor* quoted extensively from the House Report and restated the House's conclusion that marriage should be protected from the immorality of homosexuality. *Id.* at 2693. Unlike in rational basis review, hypothetical reasons for

DOMA's enactment were not a basis of the Court's inquiry. In its brief to the Supreme Court, the Bipartisan Legal Advisory Group offered five distinct rational bases for the law.  *See* Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives at 28–48, *Windsor*, 133 S. Ct. 2675 (2013) (No. 12-307), 2013 WL 267026.  *Windsor*, however, looked behind these justifications to consider Congress's "avowed purpose:" "The principal purpose," it declared, "is to impose inequality, not for other reasons like governmental efficiency."  *Windsor*, 133 S. Ct. at 2693, 2694.  The result of this more fundamental inquiry was the Supreme Court's conclusion that DOMA's "*demonstrated* purpose" "raise[d] a most serious question under the Constitution's Fifth Amendment."  *Id.* at 2693–94 (emphasis added).  *Windsor* thus requires not that we conceive of hypothetical purposes, but that we scrutinize Congress's actual purposes.   Windsor's "careful consideration" of DOMA's actual purpose and its failure to consider other unsupported bases is antithetical to the very concept of rational basis review.  *Id.* at 2693.

*Witt*'s next factor also requires that we conclude that *Windsor* applied heightened scrutiny.   Just as *Lawrence* required that a legitimate state interest justify the harm imposed by the Texas law, the critical part of *Windsor* begins by demanding that Congress's purpose "*justify* disparate treatment of the group."   *Windsor*, 133 S. Ct. at 2693 (emphasis added).  *Windsor* requires a "legitimate purpose" to "overcome[]" the "disability" on a "class" of individuals. *Id.* at 2696.  As we explained in *Witt*, "[w]ere the Court applying rational basis review, it would not identify a legitimate state interest to 'justify' . . . ." the disparate treatment of the group.  *Witt*, 527 F.3d at 817.

Rational basis is ordinarily unconcerned with the inequality that results from the challenged state action. *See McGowan*, 366 U.S. at 425–26 (applying the presumption that state legislatures "have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality"). Due to this distinctive feature of rational basis review, words like *harm* or *injury* rarely appear in the Court's decisions applying rational basis review. *Windsor*, however, uses these words repeatedly. The majority opinion considers DOMA's "effect" on eight separate occasions. *Windsor* concerns the "resulting injury and indignity" and the "disadvantage" inflicted on gays and lesbians. 133 S. Ct. at 2692, 2693.

Moreover, *Windsor* refuses to tolerate the imposition of a second-class status on gays and lesbians. Section 3 of DOMA violates the equal protection component of the due process clause because "it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition." *Id.* at 2694. *Windsor* was thus concerned with the public message sent by DOMA about the status occupied by gays and lesbians in our society. This government-sponsored message was in itself a harm of great constitutional significance: "Under DOMA, same-sex married couples have their lives burdened, by reason of government decree, in visible and public ways." *Id. Windsor*'s concern with DOMA's message follows our constitutional tradition in forbidding state action from "denoting the inferiority" of a class of people. *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (internal quotations omitted) (citation omitted). It is the identification of such a class by the law for a separate and lesser public status that "make[s] them unequal." *Windsor*, 133 S. Ct. at 2694. DOMA was "practically a brand upon them, affixed by the law, an assertion of their inferiority."

*Strauder v. West Virginia*, 100 U.S. 303, 308 (1879). *Windsor* requires that classifications based on sexual orientation that impose inequality on gays and lesbians and send a message of second-class status be justified by some legitimate purpose.

Notably absent from *Windsor*'s review of DOMA are the "strong presumption" in favor of the constitutionality of laws and the "extremely deferential" posture toward government action that are the marks of rational basis review. Erwin Chemerinsky, *Constitutional Law* 695 (4th ed. 2013). After all, under rational basis review, "it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." *Lee Optical*, 348 U.S. at 487. *Windsor*'s failure to afford this presumption of validity, however, is unmistakable. In its parting sentences, *Windsor* explicitly announces its balancing of the government's interest against the harm or injury to gays and lesbians: "The federal statute is invalid, for no legitimate purpose *overcomes* the purpose and effect to disparage and injure those whom the State, by its marriage laws, sought to protect in personhood and dignity." 133 S. Ct. at 2696 (emphasis added). *Windsor*'s balancing is not the work of rational basis review.

In analyzing its final and least important factor, *Witt* stated that *Lawrence* must have applied heightened scrutiny because it cited and relied on heightened scrutiny cases. *Witt*, 527 F.3d at 817. Part IV, the central portion of *Windsor*'s reasoning, cites few cases, instead scrutinizing Congress's actual purposes and examining in detail the inequality imposed by the law. Among the cases that the Court cites are *Romer v. Evans*, 517 U.S. 620 (1996), *Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), and *Lawrence*. In *Witt*, we thought it noteworthy that *Lawrence* did not cite

*Romer*, a rational basis case. *Witt*, 527 F.3d at 817. The citation to *Moreno*, however, is significant because the Court recognized in *Lawrence* that *Moreno* applied "a more searching form of rational basis review," despite purporting to apply simple rational basis review. *Lawrence*, 539 U.S. at 580. Our Court has similarly acknowledged that *Moreno* applied "'heightened' scrutiny." *See Mountain Water Co. v. Montana Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 599 (9th Cir. 1990). Further, the Court cited *Lawrence*, which we have since held applied heightened scrutiny. *Witt*, 527 F.3d at 816. As we stated in *Witt*, *Lawrence* did not resolve whether to apply heightened scrutiny in equal protection cases, but, nevertheless, *Lawrence* is a heightened scrutiny case. Because *Windsor* relies on one case applying rational basis and two cases applying heightened scrutiny, *Witt*'s final factor does not decisively support one side or the other but leans in favor of applying heightened scrutiny.

At a minimum, applying the *Witt* factors, *Windsor* scrutiny "requires something more than traditional rational basis review." *Witt*, 527 F.3d at 813. *Windsor* requires that when state action discriminates on the basis of sexual orientation, we must examine its actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status. In short, *Windsor* requires heightened scrutiny. Our earlier cases applying rational basis review to classifications based on sexual orientation cannot be reconciled with *Windsor*. *See Miller*, 335 F.3d at 892–93. Because we are bound by controlling, higher authority, we now hold that *Windsor*'s heightened scrutiny applies to classifications based on sexual orientation. *See Miller*, 335 F.3d at 892–93; *see also Witt*, 527 F.3d at 816–17, 821.

In sum, *Windsor* requires that we reexamine our prior precedents, and *Witt* tells us how to interpret *Windsor*. Under that analysis, we are required by *Windsor* to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection. *Lawrence* previously reached that same conclusion for purposes of due process. *Witt*, 527 F.3d at 816, 821. Thus, there can no longer be any question that gays and lesbians are no longer a "group or class of individuals normally subject to 'rational basis' review." *J.E.B.*, 511 U.S. at 143.

## IV.

### A.

Having established that heightened scrutiny applies to classifications based on sexual orientation, we must now determine whether *Batson* is applicable to that classification or group of individuals. In *J.E.B.*, the Court did not state definitively whether heightened scrutiny is sufficient to warrant *Batson*'s protection or merely necessary. *See J.E.B.*, 511 U.S. at 136 & n.6, 143. The Court explained that striking potential jurors on the basis of their gender harms "the litigants, the community, and the individual jurors" because it reinforces stereotypes and creates an appearance that the judicial system condones the exclusion of an entire class of individuals. *Id.* at 140. It added that, when viewed against the long history of women's exclusion from jury service, gender-based strikes send a message "that certain individuals . . . are presumed unqualified by state actors to decide important questions upon which reasonable persons could disagree." *Id.* at 142. With *J.E.B.*'s concerns in mind and given that classifications on the basis of sexual orientation are subject to heightened scrutiny, we must answer whether equal

protection forbids striking a juror on the basis of his sexual orientation.  We conclude that it does.

*J.E.B.* took *Batson*, a case about the use of race in jury selection, and applied its principles to discrimination against women.  As the Supreme Court acknowledged, women's experiences differed significantly from the experiences of African Americans.  *J.E.B.*, 511 U.S. at 135–36.  The Court did not require that, to warrant the protections of *Batson*, women's experiences had to be identical to those of African Americans.  *Id.*  Instead, what remained constant in the Court's analysis was its willingness to reason from the actual experiences of the group.  For women, a history of exclusion from jury service and the prevalence of "invidious group stereotypes" led the Court to conclude that *Batson* should extend to strikes on the basis of gender.  *Id.* at 131–34, 140.  Here also we must reason from the unique circumstances of gays and lesbians in our society.

Gays and lesbians have been systematically excluded from the most important institutions of self-governance.  Even our prior cases that rejected applying heightened scrutiny to classifications on the basis of sexual orientation have acknowledged that gay and lesbian individuals have experienced significant discrimination.  *See High Tech Gays*, 895 F.2d at 573; *Witt*, 527 F.3d at 824–25 (Canby, J., dissenting in part).  In the first half of the twentieth century, public attention was preoccupied with homosexual "infiltration" of the federal government.  Gays and lesbians were dismissed from civilian employment in the federal government at a rate of sixty per month.  Michael J. Klarman, *From the Closet to the Altar* 5 (2013).  Discrimination in employment was not limited to the federal government; local and state governments also excluded homosexuals, and

professional licensing boards often revoked licenses on account of homosexuality. *Id.* In 1985, the Supreme Court denied certiorari in a case in which a woman had been fired from her job as a guidance counselor in a public school because of her sexuality. *Rowland v. Mad River Local Sch. Dist.*, 470 U.S. 1009 (1985) (Brennan, J., dissenting from denial of certiorari). Indeed, gays and lesbians were thought to be so contrary to our conception of citizenship that they were made inadmissible under a provision of our immigration laws that required the Immigration and Naturalization Service (INS) to exclude individuals "afflicted with psychopathic personality." *See Boutilier v. INS*, 387 U.S. 118, 120 (1967). It was not until 1990 that the INS ceased to interpret that category as including gays and lesbians. William N. Eskridge, *Gaylaw: Challenging the Apartheid of the Closet* 133–34 (1999). It is only recently that gay men and women gained the right to be open about their sexuality in the course of their military service. As one scholar put it, throughout the twentieth century, gays and lesbians were the "anticitizen." Margot Canaday, *The Straight State* 9 (2009).

Strikes exercised on the basis of sexual orientation continue this deplorable tradition of treating gays and lesbians as undeserving of participation in our nation's most cherished rites and rituals. They tell the individual who has been struck, the litigants, other members of the venire, and the public that our judicial system treats gays and lesbians differently. They deprive individuals of the opportunity to participate in perfecting democracy and guarding our ideals of justice on account of a characteristic that has nothing to do with their fitness to serve.

*Windsor*'s reasoning reinforces the constitutional urgency of ensuring that individuals are not excluded from our most

fundamental institutions because of their sexual orientation. "Responsibilities, as well as rights, enhance the dignity and integrity of the person." *Windsor*, 133 S. Ct. at 2694. Jury service is one of the most important responsibilities of an American citizen. "[F]or most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers*, 499 U.S. at 407. It gives gay and lesbian individuals a means of articulating their values and a voice in resolving controversies that affect their lives as well as the lives of all others. To allow peremptory strikes because of assumptions based on sexual orientation is to revoke this civic responsibility, demeaning the dignity of the individual and threatening the impartiality of the judicial system.

Gays and lesbians may not have been excluded from juries in the same open manner as women and African Americans, but our translation of the principles that lie behind *Batson* and *J.E.B.* requires that we apply the same principles to the unique experiences of gays and lesbians. Gays and lesbians did not identify themselves as such because, for most of the history of this country, being openly gay resulted in significant discrimination. *See* Kenji Yoshino, *Covering*, 111 Yale L.J. 769, 814–36 (2002). The machineries of discrimination against gay individuals were such that explicit exclusion of gay individuals was unnecessary — homosexuality was "unspeakable." *Id.* at 814. In *J.E.B.*, the Court noted that strikes based on gender were a recent phenomenon because women's participation on juries was relatively recent. *J.E.B.*, 511 U.S. at 131. Being "out" about one's sexuality is also a relatively recent phenomenon. To illustrate how recently the change occurred, in 1985, only one quarter of Americans reported knowing someone who was gay. By 2000, this number increased to 75

percent of Americans.  Klarman, *From the Closet*, at 197.  As we have indicated, gays and lesbians who were "out" were punished for their openness, sometimes through imprisonment or exclusion from civil society.

*Batson* must also protect potential jurors, litigants, and the community from the serious dignitary harm of strikes based on sexual orientation because, as in the case of gender, to allow such strikes risks perpetuating the very stereotypes that the law forbids.  "It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy."  *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 237 (2005) (quoting *Strauder*, 100 U.S. at 309 (internal quotation marks omitted)).  These stereotypes and their pernicious effects are not always known to us.  "Prejudice . . . rises not from malice or hostile animus alone.  It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves."  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).  Stereotypes of gays and lesbians depict them as wealthy and promiscuous, and as "disease vectors" or child molesters.  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 982–83 (N.D. Cal. 2010).  Empirical research has begun to show that discriminatory attitudes toward gays and lesbians persist and play a significant role in courtroom dynamics.  *See* Jennifer M. Hill, *The Effects of Sexual Orientation in the Courtroom: A Double Standard*, 39:2 J. of Homosexuality 93 (2000).

As illustrated by this case, permitting a strike based on sexual orientation would send the false message that gays and lesbians could not be trusted to reason fairly on issues of great import to the community or the nation.  Strikes based on preconceived notions of the identities, preferences, and biases of gays and lesbians reinforce and perpetuate these stereotypes.[6]  The Constitution cannot countenance "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B.*, 511 U.S. at 128.

The history of exclusion of gays and lesbians from democratic institutions and the pervasiveness of stereotypes about the group leads us to conclude that *Batson* applies to peremptory strikes based on sexual orientation.

**B.**

Abbott urges us to proceed with caution in light of the significant sensitivities and privacy interests at stake in applying *Batson* to strikes based on sexual orientation.  We agree that, as the California Court of Appeal put it when it extended *Wheeler* protection, the state equivalent of *Batson*, to gays and lesbians, "No one should be 'outed' in order to take part in the civic enterprise which is jury duty." *People v. Garcia*, 92 Cal. Rptr. 2d 339, 347 (Cal. Ct. App. 2000).  For gays and lesbians, keeping one's sexual orientation private has long been a strategy for avoiding the ramifications

---

[6] True, attitudes toward gays and lesbians are rapidly changing, just as attitudes toward women's role in civic life had changed by the time the Supreme Court decided *J.E.B.* in 1994.  The central premise of *J.E.B.*, however, was that the courtroom should not be a site for "ratify[ing] and reinforc[ing] prejudicial views," even if such prejudicial views are on the decline.  *J.E.B.*, 511 U.S. at 140.

— job loss, being disowned by friends and family, or even potential physical danger — that accompanied open acknowledgment of one's sexual orientation for most of the twentieth century and sometimes even today.  For some individuals, being forced to announce their sexuality risks intruding into the intimate process of self-discovery that is "coming out," a process that can be at once affirming and emotionally fraught.  Equally important, coming out for many gays and lesbians is a life-defining moment of celebrating one's dignity and identity.  Deciding when, and how, and to whom one comes out is a vital part of this process, and it should not be co-opted in the name of affording a group that has long been discriminated against the constitutional rights to which it is entitled.

These concerns merit careful consideration, but they do not warrant the conclusion that the Constitution necessitates permitting peremptory strikes based on sexual orientation. Concerns that applying *Batson* to sexual orientation will jeopardize the privacy of gay and lesbian prospective jurors can be allayed by prudent courtroom procedure.  Courts can and already do employ procedures to protect the privacy of prospective jurors when they are asked sensitive questions on any number of topics.  Further, applying *Batson* to strikes based on sexual orientation creates no requirement that prospective jurors reveal their sexual orientation.  A *Batson* challenge would be cognizable only once a prospective juror's sexual orientation was established, voluntarily and on the record.  California's successful application of *Wheeler* protections to sexual orientation for the past thirteen years illustrates that problems with administration can be overcome, even in a large judicial system that comes in contact with a diverse population of court users. *See Garcia*, 92 Cal. Rptr. 2d at 348.

## V.

Abbott contends that any exclusion of a juror in violation of *Batson* would have been harmless because none of GSK's claims should have been submitted to the jury.  It asserts that there was not sufficient evidence to support any of those claims.

We have held that "[t]here is no harmless error analysis with respect to *Batson* claims," *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997); *see also Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (holding that the "right to an impartial adjudicator, be it judge or jury" is among those constitutional rights so basic "that their infraction can never be treated as harmless error").  There are two reasons for this.

First, it is impossible to determine whether a jury verdict would have been different had the jury been constitutionally selected.  *See Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("[W]hen a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained.").  Second, even if it were possible to find that a jury verdict had been unaffected by the error, this would not render the error harmless, as the harm from excluding a juror in violation of *Batson* is far greater than simply the effect upon the verdict.

In *Powers v. Ohio*, 499 U.S. 409 (1991), the Supreme Court held that a defendant may object to the race-based exclusion of jurors even if the defendant and the excluded jurors are not of the same race.  *Id.* at 415.  In so holding, the Court explained that a *Batson* violation injures the unconstitutionally stricken juror as well as the parties: "[a]

venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character." *Powers*, 499 U.S. at 413–14. Moreover, a *Batson* violation undermines the integrity of the entire trial:

> [The] wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. The *voir dire* phase of the trial represents the jurors' first introduction to the substantive factual and legal issues in a case. The influence of the *voir dire* process may persist through the whole course of the trial proceedings.

*Powers*, 499 U.S. at 412 (internal quotation omitted). In *Powers*, the Court further stated that "discrimination in the selection of jurors casts doubt on the integrity of the judicial process" and "may pervade all the proceedings that follow." *Id.* at 411, 413; *see also J.E.B.*, 511 U.S. at 140 ("Discrimination in jury selection . . . causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. . . . The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders."). Because the effect of excluding a juror in violation of *Batson* is so pervasive, it cannot be

deemed harmless, and therefore we do not subject such violations to harmless error review.

Abbott urges an exception to this rule, citing an unpublished disposition, *United States v. Gonzalez-Largo*, 436 F. App'x 819, 821 (9th Cir. 2011), that relies on *Nevius v. Sumner*, 852 F.2d 463, 468 (9th Cir. 1988). In *Nevius*, which was decided before *Powers* and *J.E.B.*, we stated that a *Batson* violation is harmless where the challenged juror would have been an alternate who would not have been called to serve as a juror in any event. *Nevius*, 852 F.2d at 468. Here, Abbott argues that the *Batson* error is harmless because none of the claims should have been allowed to go to the jury for various reasons, including insufficiency of evidence. Even were we to accept Abbott's harmlessness exception, it would not apply here.

As agreed by the parties, the contract claim is governed by New York law. Abbott argues, first, that its conduct did not violate any implied covenant in its contract with GSK because that contract contained no agreement as to price. There was evidence, however, from which a jury could find that Abbott's conduct had "injur[ed]" GSK's right to "receive the fruits of the contract," and was meant to have that impact. Such proof is sufficient under New York law to find a breach of an implied covenant. *See 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). Abbott's second argument, that the contract's limitation-of-liability clause bars any damages award, is premised on the "jury['s] reject[ion of] GSK's theories involving tortious gross negligence and intent to harm . . . ." As the jury findings were tainted by the *Batson* violation, we cannot rely

on them to support enforcement of the limitation-of-liability clause.[7]

In conclusion, the district court properly found that GSK's contract claim does not fail as a matter of law.[8]  Thus, even if *Batson* violations were subject to harmless error analysis where the losing party should have prevailed as a matter of law and no jury verdict should have been rendered, the exclusion of a juror in violation of *Batson* was not harmless here, as a jury was necessary to resolve the case. Therefore, we remand for a new trial.[9]

## VI.

We hold that heightened scrutiny applies to classifications based on sexual orientation and that *Batson* applies to strikes on that basis.  Because a *Batson* violation occurred here, this case must be remanded for a new trial.

### REVERSED AND REMANDED.

---

[7] We have considered and rejected Abbott's other arguments with regard to the contract claim.

[8] Abbott has argued only that structural error does not apply because *no* claim should have gone to the jury.  As we hold to the contrary with regard to the implied covenant claim, we need not consider whether the district court erred in submitting the UTPA and antitrust claims to the jury.

[9] Our holding that the contract claim does not fail as a matter of law resolves Abbott's sole contention on direct appeal, that the district court should have granted its 50(b) motion for judgment as a matter of law on this claim.  We need not address GSK's remaining claim on cross-appeal — that the UTPA verdict was inconsistent with the jury's findings — as we remand for a new trial and new findings.